E-FILED
Monday, 28 May, 2018  10:22:21 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
Peoria Division

| | | |
|---|---|---|
| EDWARD L. YOUNGMAN, | ) | |
| | ) | |
| **Plaintiff,** | ) | No: 16 CV1005 |
| | ) | |
| vs. | ) | |
| | ) | |
| CHIEF JUDGE STEPHEN A. KOURI and PEORIA COUNTY, | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Edward L. Youngman ("Youngman" or "Plaintiff"), by and through his counsel, Michael T. Smith, respectfully submits this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment. For the reasons set forth herein, Plaintiff respectfully requests that this court deny Chief Judge Stephen A. Kouri ("Defendant") and Peoria County's[1] ("Peoria County", and collectively referred to as "Defendants") motion in its entirety.

### A.      INTRODUCTION

As an initial matter, Defendant attempts to evade liability in this case based upon a technical defect in Plaintiff's IDHR charge, specifically, that Plaintiff did not correctly name his employer, the Chief Judge of the Tenth Judicial Circuit ("Chief Judge"), on the charge.  While it is true that Plaintiff erroneously named Peoria County Juvenile Detention Center (which is merely the name of a building and is not an employer of anyone) on his IDHR charge as the respondent, this fact does not save the day for Defendant.  Defendant made no effort to bring the

---

[1] Peoria County filed a separate Motion for Summary Judgment, which will be addressed in a separate response brief to be filed by Plaintiff, but also joined the procedural and substantive arguments made by Chief Judge Stephen A. Kouri.  As such, Plaintiff herewith responds to both Defendants' procedural and substantive arguments contained within Chief Judge Stephen A. Kouri's Motion for Summary Judgment.

error to light, but instead, sneakily stepped up to the plate by substantively responding to the charge, answering the IDHR's questionnaire, submitting a position statement, and appearing at the fact finding conference.  The person signed all those documents and who appeared at the fact finding conference relating to the charge was none other than Brian Brown, Superintendent of the Peoria County Juvenile Detention Center, whose sole employer was, of course, the Chief Judge.  Regardless of Plaintiff's error, Mr. Brown appeared before the IDHR on behalf of the Chief Judge, thus the Chief Judge did, in fact, have an opportunity to participate in the administrative process, which, as will be discussed below, is enough.

The substantive case that is before this Court is actually strikingly unfortunate.  Plaintiff, an unquestionably disabled individual who truly loved his position as a youth counselor for Defendant for over 13 years, was forced on medical leave after Mr. Brown played a another kind of "hide the ball" game with Plaintiff.   Due to his long time disability of acromegaly, as well as the disability of hypothyroidism with severe hypocalcemia that was diagnosed in 2011, the unique combination of stimuli in the control room caused Plaintiff severe discomfort including symptoms of headache, ringing in the ears, and fatigue, among others.  Working in the control room on a regular basis or for extended periods of time was not an essential duty of Plaintiff's position, as he had only been assigned to the control room approximately 5 times during the 13 years that preceded the events giving rise to his claim against Defendant. Despite this, Plaintiff was able to tough it out and work for three consecutive days in the control room for training purposes in late 2011/early 2012 and did not ask for any accommodation at that time, although his supervisor, Sherry Kramer, did notice Plaintiff's discomfort by the third day.

A change was apparently made to Defendant's training policy in or around July of 2012 that required all youth counselors to work in the control room for one to two weeks per year,

depending on how proficient the employee proved himself or herself to be performing control room duties at the time. Consequently, Plaintiff was assigned to the control room in July of 2012. The problem is that Defendant did not bother to mention to Plaintiff that his assignment to the control room was for training purposes and would likely only be for one week per year; for all Plaintiff knew, he was there indefinitely. Consequently, after the third day in the control room, Plaintiff contacted his doctor, Dr. Doering, to explain the situation and requested he be provided with a note excusing him from assignment to the control room. After Plaintiff requested the accommodation, Defendant denied the request and, again, failed to mention that the assignment was temporary or that he was likely already 3/5's of the way through. Instead, Defendant maliciously used his doctor's note to force him on light duty, which pursuant to Defendant's policy, was to be served in control room, which, of course, was the exact *opposite* of the accommodation he was seeking. Defendant allowed Plaintiff to work there for several more days, well past the one week training period, before using his doctors' notes to force him on medical leave.

Defendant failed to accommodate Plaintiff and failed to engage him in an interactive process to see what alternative accommodations could have been made. Accordingly, Plaintiff requests that this Court deny Defendants' Motion for Summary Judgment in its entirety.

## B.     RESPONSE TO DEFENDANT'S UNDISPUTED MATERIAL FACTS

### i.    Undisputed Material Facts

The facts identified in Defendant's Motion for Summary Judgment to which Plaintiff does not dispute or object to are the following[2]:

---

[2]  The listing of any fact in this subsection is intended only to mean that Plaintiff has no legitimate objections and is not in possession of any admissible evidence at this time which could invalidate or dispute the numbered fact listed in Defendant's Memorandum of Law in Support of Motion for Summary Judgment as an "undisputed material fact" Such "admissions" are intended *only for purposes of summary judgment* pleading practice pursuant to Local Rule

1.  The Peoria County Juvenile Detention Center (Peoria County JDC) is a 63-bed facility used to detain juveniles age 10 to 18 in a secure, rehabilitating environment while providing for the needs of that population, including education, mental, medical, and dental health as well as faith-based services.

2.  Beginning in October 1998, Plaintiff was employed by the Chief Judge as a Youth Counselor.

3.  Youth Counselors staff the Peoria County JDC 24 hours a day, seven days a week and are responsible for the supervision, safety, care, and counseling of the juvenile detainees at the Peoria County JDC in order to provide a secure, structured environment conducive to the physical safety and well-being of up to 63 detainees.

6.  Youth Counselors' job duties in the control room include continuous electronic monitoring of activities throughout the JDC; electronically controlling access into secure areas; monitoring juveniles who are problematic, emotionally stressed, or have medical conditions; and identifying unusual and dangerous conditions and notifying proper personnel.

7.  In 2012, the control room had computer monitors (which displayed security camera footage), switchboards, a radio, and a telephone. [3]

---

7.1(D) and applicable case law.  The listing of any fact in this subsection does not mean that Plaintiff admits that the alleged fact is actually true Plaintiff reserves the right to contest any such "admitted" facts at a later stage in litigation or for any purpose other than to respond to Defendant's Motion for Summary Judgment.
[3] (*See also* Plf.'s Statement of Additional Facts ¶¶ 118-119, *infra*).



Youngman v. Kouri (16-1005) Chief Judge Doc.001063



Youngman v. Kouri (16-1005) Chief Judge Doc.001064

8.  The control room is 24' by 19'3". The size of the control room can be seen in the below three pictures. Equipment that was not present in 2012 is marked through with a red "X." Monitors that were smaller in 2012 are circled in purple.[4]

9.  There are overhead fluorescent lights in the control room, which are the same lights used throughout the entire Peoria County JDC. However, Youth Counselors who work in the control room have the discretion to turn off the overhead lights.

10.  For Youth Counselors who worked the first shift (7:00 a.m. to 3:00 p.m.), the job duties were divided into three separate assignments: (1) control room; (2) living units; and (3) floaters. Prior to 2010, there was also an assignment referred to as "security unit," which meant that a Youth Counselor was assigned to work one of the living units in which the juveniles were on lock down.

11.  During all relevant times to this case, Plaintiff worked the first shift and his regularly scheduled work days were Sunday through Thursday.

12.  On a typical first shift, one Youth Counselor was assigned to the control room and two Youth Counselors were assigned as floaters. At least one Youth Counselor had to be present in the control room to perform the required duties 24 hours a day, seven days a week.

13.  Youth Counselors assigned as floaters were responsible for filling in for the other assignments (control room and living unit) when those employees needed breaks or lunch.

---

[4] While Plaintiff does not dispute the dimensions of the control room as alleged by Defendant and admits that the dimensions of the control room may be tangentially relevant, Plaintiff denies that the photos are an accurate depiction of a room as it existed 6 years before the photos were taken. This alleged fact does not specify the exact date that the photos were taken, or by whom they were taken, but Defendant does state in a footnote that the photos were taken in 2018. (*See* Def.'s Memorandum in Supp. of Mot. for Summary Judgment at p. 5, FN 2, Dkt. No. 34; Brown Decl. at ¶ 14, Def.'s Ex. 1). Plaintiff objects to the inclusion of these photos in this fact on grounds of relevance and because they may be more prejudicial than probative as they unfairly depict every minute detail of a room that simply does not depict the details of the room as they existed 6 years earlier.

Floaters were also responsible for transporting meals to the JDC, transporting juveniles to court or outside medical appointments, and cleaning the JDC.

14.  The Peoria County JDC has three separate living units, A-Unit, B-Unit, and C-Unit. During the time relevant to this lawsuit (July and August 2012), only two of the units (B and C) were in use.

16.  On a typical first shift, two or three Youth Counselors would be assigned to each of the living units.

17.  Youth Counselors assigned to a living unit were responsible for overseeing the daily routine of the juveniles, including monitoring their hygiene; escorting juveniles to the cafeteria, educational rooms, and PE; monitoring the juveniles at all times; and writing reports when necessary.

19.  A Youth Counselor must be present at all times while juveniles are in an educational room. Juveniles from one living unit will be separated into two or more educational rooms. Therefore, each Youth Counselor assigned to a living unit is expected to be present in an educational room during the work day in order to monitor the juveniles.

23.   Youth Counselors were directly supervised by Detention Supervisors, who were responsible for assigning each Youth Counselor to one of the three possible assignments. Youth Counselors were typically given one assignment for the work week. During all times relevant to this case, Sharon Kramer was the Detention Supervisor assigned to first shift and was the direct supervisor of Plaintiff. In 2012, Detention Supervisors reported directly to Superintendent Brown.

25.  Each Youth Counselor had a preferred job assignment. Some Youth Counselors preferred assignment to the control room, some preferred being a floater, and some preferred

being assigned to a living unit.

27.  Soon after becoming the Superintendent, Brian Brown instructed Detention Supervisors for all shifts to assign each employee to each assignment in order to be sure that all Youth Counselors could perform all duties.

29.  As a result of the investigation into Billingsley's complaint, Peoria County determined that there was no harassment or hostile work environment, but did recommend that Superintendent Brian Brown review scheduling including an assessment of the rotation of assignments and review the Youth Supervisor job description looking specifically at the duties associated with the control room. *See* Exhibit 1, Brian Brown Affidavit, ¶24; Exhibit 1-G, Peoria County Investigation.

30.  On October 27, 2011, the issue of assigning Youth Counselors to the three possible assignments was discussed during a labor management meeting. During that meeting, Superintendent Brown took the position that all Youth Counselors needed to be trained everywhere and rotate in all duties.

31.  After the Billingsley complaint, Superintendent Brown continued to direct Detention Supervisors to assign each Youth Counselors to be able to perform all duties within the job description, including the duties in the control room, living units, and floater position.

32.  Before 2012, all Youth Counselors on first shift who were not regularly assigned to the control room, including Ed Youngman, would be assigned for at least a couple of days so that everyone could perform those duties in an emergency.

33.  Beginning in 2012, all Youth Counselors on first shift who were not regularly assigned to the control room would be assigned for one or two weeks a year to ensure they could perform the duties.

34.  Although there is typically only one Youth Counselor assigned to the control room during each shift, in order to ensure that an inexperienced Youth Counselor was able to perform the job duties, two employees would be assigned to the control room for the first two days of the week.

35.  Plaintiff was typically assigned to a living unit and was occasionally assigned as a floater. In his 13 years with Peoria County JDC, Plaintiff had been assigned to the control room less than ten or fourteen times.

36.  Having someone in the control room is an important part of the operation of the facility, because that person was responsible for electronically controlling the doors used to get into the JDC and could electronically open other doors, including the doors to a juvenile's room, in an emergency.

37.  It was important that the person assigned to the control room knows how to use all of the equipment in the control room.

38.  Detention Supervisor Sharon Kramer assigned Plaintiff to the control room for the week beginning Sunday July 29, 2012 through Thursday August 2, 2012. For the first two days, Pauline Harris was assigned to work the control room with Plaintiff.

39.  Plaintiff testified that he does not know why he was assigned to the control room in July and August of 2012.

41.  Plaintiff called in sick on July 31, 2012, the third day he was assigned to the control room.

42.  On August 1, 2012, which was the fourth day Plaintiff was assigned to work the control room, Plaintiff gave his supervisor, Sharon Kramer, a note signed by Dr. Jacob Doering stating, "p[atien]t can not work in control room due to medical concerns." The note provided no

further information.

43.  In order to obtain this doctor's note, Plaintiff called his doctor and asked if he could write a note due to his medical conditions. Dr. Doering did not see Plaintiff in regards to the alleged motion sickness prior to writing the August 1, 2012 note.[5]

44.  That same day, Superintendent Brown, after discussing the situation with Peoria County Human Resources and his supervisor, Director of Court Services Dan Hunt, gave Plaintiff a letter stating that Dr. Doering's note was too vague, and requesting information regarding: (1) what work restrictions he was actually requesting, (2) what particular duties within the control room he could not complete, and (3) what medical condition and/or physical symptoms prevent him from performing his job duties. Superintendent Brown stated that, after receiving this information, he would schedule a meeting with Plaintiff to discuss how to proceed.

45.  Plaintiff did work his regularly scheduled shift in the control room on August 1, 2012. On August 2, 2012, Plaintiff worked in the control room for six hours and then used two hours of sick time.

46.  The first, and only, time that Dr. Doering saw Plaintiff in regards to his motion sickness was August 2, 2012. During that office visit, Dr. Doering did not perform any objective tests to determine whether anything was causing Plaintiff's ear pain besides motion sickness.

47.  Until additional information was received regarding Plaintiff's medical condition and restrictions, Plaintiff was officially placed on light duty on August 2, 2012.

48.  Pursuant to Peoria County JDC policy, when an employee is suffering from an

_____

[5] While the first sentence in this fact is material and undisputed, the second sentence is disputed and immaterial. The second sentence is disputed to the extent that the allegation implies that Plaintiff had never discussed the effect that the control room had on him prior to August 1, 2012.  Plaintiff was assigned to the control room in 2011 or early 2012 by Ms. Kramer.  After he was assigned to work in the control room on that occasion by Ms. Kramer, Plaintiff called Dr. Doering and told him about how working in that room made him ill.  Dr. Doering told Plaintiff that if he ever needed an accommodation to let him know.  (Plf.'s Dep. pp. 56, 120, Plf.'s Ex. 2).

ailment or condition that temporarily makes them unable to perform their regular job duties, they will be provided with a light duty assignment for a limited time at the discretion of the Superintendent. Pursuant to this policy, an employee on light duty is assigned to the control room.

49.  As a result of being placed on light duty, which required assignment to the control room, Plaintiff was assigned to the control room August 5, 2012 through August 9, 2012.

50.  On August 5, 2012, Plaintiff submitted a note from Dr. Doering stating,

Patient is having motion sickness related to control room he has recently been assigned to. Recommend patient not work in control room other than briefly going in and out if needed but rather should be place [sic] elsewhere for his job. Because of lights, noise, cameras, tv's in room having motion sickness symptoms of lightheadedness, ringing in ear, headache. Diagnosis is motion sickness."

51.  On August 5, 2012, Plaintiff submitted a written response to Superintendent Brown's request for information, stating,

I am writing this in response to your memorandum dated 8/1/12, re – my medical note. The only restriction I am requesting is to not work in the control center, due to my medical concern of motion sickness. I am capable, and do complete all job duties in control. However, when I am in the control center, the following physical symptoms occur: 1. pain/ringing in ear that radiates to head and neck[,] 2. headache[,] 3. dizziness[,] 4. nausea. These symptoms are brought on by the confined space in the control center, combined with the large amount of electronics, and the activity and noise that comes from them. In closing, I am requesting to work living units, floater duties, or security unit."

65.  Plaintiff worked his regularly scheduled shift in the control room August 5 through August 9, 2012.

66.  On August 7, 2012, Superintendent Brown issued a letter to Plaintiff directing him to submit to a fit for duty exam on August 9, 2012 with Dr. Hauter. Plaintiff was also informed that he could use benefit time to be off work until the exam and that FMLA paperwork would be made available to him.

67.  On August 9, 2012, Plaintiff was again seen by Dr. Hauter for his fit for duty exam.

11

In his visit note, Dr. Hauter stated that Plaintiff could not return to work without restrictions "as he has an imminent risk of injury to himself or others." Dr. Hauter stated that Plaintiff may be able to perform some of the job activities of a Youth Counsel if the job could be modified to include the following restrictions: no viewing of multiple TV or monitor screens, avoid rapid alternating movements, avoid flashing lights, and no commercial driving.

68.  On August 10, 2012, (one of Plaintiff's regularly scheduled days off), Superintendent Brown met with Peoria County Human Resources to discuss Dr. Hauter's fit for duty exam. It was decided that Plaintiff would be placed on a medical leave of absence for the safety of Plaintiff's co-workers and the juvenile detainees based on the information received from Drs. Hauter and Doering. Specifically, both doctors agreed that Plaintiff could not perform various essential job duties because of his restrictions, including rapid alternating movements (which could be necessary in the restraint of a combative juvenile), flashing lights, TVs, and monitors.[6]

69.  On August 12, 2012, which was Plaintiff's next regularly scheduled shift, Superintendent Brown and Ryan Breedlove met with Plaintiff to explain that, based on his restrictions, he was going to be placed on a medical leave of absence until his condition improved enough to allow him to perform the essential functions of the job without presenting a danger to himself or others.

71.  Plaintiff testified that he asked for "the simple accommodation of working outside the control room" and that Brian Brown told Plaintiff he (Brown) could not do that.

72.  Plaintiff never proposed any accommodations that would make it possible for him to work in the control room. Instead, Plaintiff asked to work every assignment outside of the

---

[6] While Plaintiff admits the first two sentences in this fact, he denies the last sentence.  Plaintiff denies that the control room was an essential function of the position because, prior to the occasions he was assigned to the control room giving rise to this lawsuit, he had in the control room only 5 days in 13 years, and that was because he was assigned to light duty due to a work related injury.  (Plf.'s Dep. at pp. 206:12-207: 4, , Plf.'s Ex. 2).

control room, even though he was able to do every job in the control room exceedingly well.

73.  Although Plaintiff claimed he could perform all control room functions exceedingly well, he also admitted that, "if something would have happened, I would have been the last person[7] they wanted in there because they wouldn't have been able to contact me."

74.  After the conversation with Plaintiff, Brian Brown issued a letter to Plaintiff placing him on medical leave and directing him to complete FMLA paperwork.

75.  On August 16, 2012, Peoria County Human Resources received FMLA paperwork for Plaintiff completed by Dr. Doering. According to this paperwork, Plaintiff's condition commenced on July 29, 2012 and the probable duration of the condition was "continual if working in control room." Dr. Doering saw Plaintiff for this condition on one date, August 2, 2012. Plaintiff's condition would not require treatment visits at least twice per year. Plaintiff was not prescribed medication and was not referred to another health care provider. Dr. Doering stated that Plaintiff was unable to perform any job in the control room. Dr. Doering stated that the other relevant medical facts related to the condition were "motion sickness from control room monitors/noise."

76.  In response, Peoria County Human Resources employee Romonia Claybon-Harrell asked Dr. Doering to clarify in section 3 of the FMLA paperwork which actual job duties Plaintiff was unable to perform. In response, Dr. Doering wrote, "Any job in the control room including hearing and carrying conversation, reading and corresponding to info on computer screen, or sitting/walking/standing in the control room."

77.  In response, Peoria County Human Resources employee Romonia Claybon-Harrell

---

[7] This fact as written is slightly misleading as it is taking Plaintiff's testimony out of context. Plaintiff stated that he had to work in the control room for two weeks. He was then asked if he could have continued, to which he responded, "I mean, I could have daily, but not without being debilitated by the end of the day. If something would have happened, I would have been the last person they wanted in there because they wouldn't have been able to contact me." (Plf.'s Dep. 204:7-15, Def.'s Ex. 2).

informed Dr. Doering that she could not determine which duties, based on Plaintiff's job description, Plaintiff could not perform. Ms. Claybon-Harrell sent Plaintiff's job description, stating that she "circled the physical requirements that [she] believe[s] he may be unable to perform based on the current certification. Is that correct?" The following physical requirements were circled:

- Incumbent is required to sit, stand, and walk for various amounts of time to complete duties.

- Hearing and speaking ability sufficient to carry on conversations with other individuals in person, over the telephone, and over the intercom.

- Visual ability sufficient to read and complete written correspondence and read information on a computer screen.

79.   On September 6, 2012, Plaintiff was granted FMLA leave and was instructed that while on leave, he was required to provide an update on his medical condition no later than September 24, 2012, and every 30 days thereafter.

80.   From September 2012 through February 2013, Plaintiff submitted monthly updates regarding his condition from Dr. Doering. Each update stated that Plaintiff's condition had not changed.

81.   On February 12, 2013, Peoria County sent a letter to Plaintiff stating that his FMLA leave has expired and that because he had been on medical leave for over 6 months, his position would be filled and when he is able to return to work, he would be placed in the first available opening most comparable to his previous job. Plaintiff was again informed that he needed to provide updates from his doctor every 30 days.

82.   On February 14, 2013, Plaintiff filed a charge of discrimination with the Illinois Department of Human Rights (IDHR) against the "Peoria County Juvenile Detention Center" alleging that he was discriminated against because of his disability. This was the only charge of

discrimination that Plaintiff filed.

83.   In his charge of discrimination, Plaintiff alleged the JDC failed to accommodate his "mental disability, pituitary tumor with acromegaly," failed to accommodate his "mental disability, hypothyroidism with chronic calcium deficiency," and forced him on a medical leave because of both disabilities. Plaintiff alleged he was denied the accommodation of working outside the control room.

105.   When asked to state all facts and identify all supporting information which indicate that he was subjected to discrimination based on a disability, Plaintiff did not allege that his termination was disability discrimination.

106.   To ensure that everyone was able to work the control room, Kramer assigned Youth Counselors (other than just the Plaintiff) to the control room for at least a week at a time, including Doug Passmore, Jim Anderson, Chad Weber, and Ryan Burge. Kramer routinely assigned Pauline Harris, Leslie Galloway, and Carrie Conner to the control room, so there was no need to make a special effort to give them that assignment.

107.   To ensure that everyone was able to work the living units and as a floater, Kramer assigned Youth Counselors who typically worked the control room to those assignments, including Pauline Harris, Leslie Galloway, and Carrie Conner.

109.   Every Youth Counselor who had a work restriction based on a medical condition was placed on light duty, which meant that they were assigned to the control room, unless the control room assignment was not available on that shift because it was already filled by a person on light duty.

110.   Light duty was for pregnant women, people with injuries who would not be able to restrain a juvenile, people on crutches, people with blown out knees or ankles, people who need

15

to work away from the kids. These people would bring in a doctor's note and would be assigned to the control room.

111.  When asked who was treated differently than him, Plaintiff provided no examples and testified that when he said people are treated differently, he was not saying that he was treated differently than others at the JDC.

### ii.    **Disputed Material Facts**

4.    Youth Counselors' job duties include direct supervision of detainees; intake, discharge, and referral of juveniles to appropriate agencies, including the using of web-based software systems and performing data entry; providing appropriate contacts with law enforcement agencies, parents, guardians, attorneys, juvenile agencies, and the general public; assisting in the upkeep of the facility, including cooking, cleaning, maintenance, meal transport; completing reports, including court reports; dispensing medication; conducting 15 minute visual checks and/or suicide watch; using electronic equipment and radios for facility communications and documenting detainee locations; and participating in mandatory video surveillance. (Exhibit 1-A, Youth Counselor Job Description).

**RESPONSE:  This fact is denied to the extent that the list of Counselor job duties includes duties that were not actually Counselor job duties.  For instance, Counselors did not have to do fingerprinting, mug shots, cooking, cleaning, or maintenance.  (Plf.'s Dep. at pp. 207:5-208:6, Plf.'s Ex. 2).  The remainder of this statement of fact is admitted.**

5.  Youth Counselors also have job duties specifically related to the control room, which serves as the location in which the JDC can be electronically monitored and controlled. (*See* Exhibit 1, Brian Brown Affidavit, ¶5; Exhibit 1-A, Youth Counselor Job Description).

16

**RESPONSE:** Plaintiff objects to this statement of fact as being vague and ambiguous as to the word "job duties" as it does not distinguish between essential and non-essential job duties. Plaintiff admits that some Counselors did work in the control room as a "light duty" assignment and that the control room may be considered a non-essential job duty for the Counselor position.  Plaintiff denies that the control room was an essential function of the position because, prior to the occasions he was assigned to the control room giving rise to this lawsuit, he had in the control room only 5 days in 13 years, and that was because he was assigned to light duty due to a work related injury.  (Plf.'s Dep. at pp. 206:12-207: 4, , Plf.'s Ex. 2).  The remainder of this statement of fact is admitted.

24.   All Youth Counselors were supposed to be able to perform the duties for all assignments. *See* Exhibit 1, Brian Brown Affidavit, ¶26.

**RESPONSE:** The allegation that "all Youth Counselors were supposed to be able to perform the duties for all the assignments" is vague and ambiguous as to the terms "supposed to", "duties", and "assignments".  To the extent that Defendant is alleging that all Counselors had to be able to work in the control room and was thus and "essential" duty of the position, that allegation is denied because, prior to the occasions Plaintiff was assigned to the control room giving rise to this lawsuit, he had in the control room only 5 days in 13 years, and that was because he was assigned to light duty due to a work related injury.  (Plf.'s Dep. at pp. 206:12-207: 4, , Plf.'s Ex. 2).

40.   Plaintiff successfully completed his duties on July 29, 2012 and July 30, 2012. Despite being present both days, Detention Supervisor Kramer did not observe Plaintiff having

17

any difficulties working in the control room and did not receive any complaints from Plaintiff regarding working the control room, other than Plaintiff stating he felt overwhelmed. Additionally, Pauline Harris did not report that Plaintiff had any difficulties. Superintendent Brown, who typically works Mondays through Fridays, did not observe Plaintiff having any difficulties working the control room. *See* Brian Brown Affidavit, ¶36-37; Exhibit 1-Q, Payroll Records; Exhibit 3, Sharon Kramer Affidavit, ¶7.

**RESPONSE:** **Plaintiff disputes that Ms. Kramer did not see Plaintiff was having difficulties based upon the fact that she told Plaintiff, "I know how it makes you sick," in reference to the control room and also apologized for having to send Plaintiff back to the control room after he provided her with a note from Dr. Doering.  (Plf.'s Dep. p. 119:3-7, 124:3-16, 124:20-125:3, Plf.'s Ex. 2; Plf.'s Decl. ¶¶ 14-15, Plf.'s Ex. 1;** *see also* **Def.'s Ex. 1-M).**

52.   Dr. Doering, who Plaintiff identified as an expert witness, testified that Plaintiff's motion sickness and the symptoms he experienced in the control room could not be related to his acromegaly, hypothyroidism, or hypocalcemia. The medication Plaintiff was taking for hypothyroidism and calcium deficiency could not cause dizziness. The medications Plaintiff was taking as of August 2, 2012, could not cause nausea or headaches. *See* Exhibit 4, Doering Deposition at 32-35, 42-43.

**RESPONSE:**   **First, Plaintiff initially listed Dr. Doering as a non-retained expert witness, but Plaintiff removed him as an expert witness and Dr. Doering explicitly stated that he was not an expert witness and that most of his patients who have had their thyroids removed do not experience the calcium deficiency complications that Plaintiff experienced.**

18

(*See* Doering Dep. p. 12:16-13:5, 23:7-16; Plf.'s Ex. 14;  Plf.'s Fourth Amended Rule 26 Disclosures, Plf.'s Ex. 8).  Defendant responded by listing Doering as an expert witness in amended Rule 26 Disclosures.

Second, Dr. Doering stated that he did not know if the symptoms could be related to hypocalcemia, however, he reviewed one of his trusted sources during the deposition and found that Hypocalcemia can cause vomiting.  (Doering Dep. p. 33:17-19, 34:7-21, Plf.'s Ex. 14).

Third, when Plaintiff went to see Dr. Doering, he told Plaintiff, "The medical conditions you have and the disabilities you have can be exacerbated by certain stimuli." (Plf.'s Dep. pp. 121:9-122:13, Plf.'s Ex. 2; Plf.'s Decl. ¶ 15, Plf.'s Ex. 1).

Fourth, Dr. Doering's August 2, 2015, note states, "Patient is having motion sickness related to control room he has recently been assigned to. Recommend patient not work in control room other than briefly going in and out if needed but rather should be place [sic] elsewhere for his job. Because of lights, noise, cameras, tv's in room having motion sickness symptoms of lightheadedness, ringing in ear, *headache.* Diagnosis is motion sickness." (emphasis added) (<u>Dr. Doering August 2, 2015</u>, <u>Note</u>, Def.'s Ex. 1-M).  Dr. Doering testified that acromegaly can cause someone to experience more headaches and can certainly have the big physical findings of larger head, larger hands, larger feet.  (Doering Dep. p. 12:16-13:2, Plf.'s Ex. 14).  Dr. Doering testified that Family Practice Notebook is one of two primary sources when researching medical conditions and that it is a common source used by amongst family doctors.  (Doering Dep. p. 13:15-14:8, Plf.'s Ex. 14).  Family Practice Notebook[8] states that hypocalcemia symptoms include headache and vomiting and

---

[8] FPnotebook.com is a rapid access, point-of-care medical reference for primary care and emergency clinicians. (available at https://fpnotebook.com/about.htm).

acromegaly symptoms include headache.   __Family Pracitive Notebook - Hypocalcemia__[9], __Family Pracitive Notebook - Acromegaly__[10], Plf.'s Ex. 6).

　　Dr. Doering also lists Mayo Clinic as a trust source in the medical profession with top notch doctors who do top notch research.  (Doering Dep. p. 69:19-70:4, Plf.'s Ex. 14). Mayo clinic states, "Acromegaly is a hormonal disorder that develops when your pituitary gland produces too much growth hormone during adulthood. When this happens, your bones increase in size, including those of your hands, feet and face. Acromegaly usually affects middle-aged adults." Acromegaly can cause fatigue and muscle weakness, impaired vision, and headaches.  (__Mayo Clinic - Acromegaly - Symptoms and Causes__[11], Plf.'s Ex. 5). The National Institute of Diabetes and Digestive and Kidney Diseases[12] also lists fatigue and weakness, headaches, and impaired vision as Acromegaly symptoms.   (__NIDDK - Acromegaly__[13], Plf.'s Ex. 5).  Medline Plus[14] lists "easy fatigue . . . decreased peripheral vision . . . headache" as symptoms of Acromegaly.  (__MedlinePlus - Acromegaly__[15], Plf.'s Ex. 5).  Stanford Healthcare also lists headaches and dizziness as symptoms.  (__Stanford Healthcare - Acromegaly__[16], Plf.'s Ex. 5). UCLA Pituitary Tumor Program also lists headaches as symptoms of Acromegaly.  (__UCLA Pituitary Tumor Program - Acromegaly__[17],

---

[9] Available at https://fpnotebook.com/Renal/Calcium/Hypclcm.htm

[10] Available at https://fpnotebook.com/Endo/Pituitary/Acrmgly.htm

[11] Available at https://www.mayoclinic.org/diseases-conditions/acromegaly/symptoms-causes/syc-20351222

[12] The National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK) is part of the National Institutes of Health (NIH), the nation's medical research agency. We conduct and support biomedical research, disseminating research findings and health information to the public, and are part of the U.S. government under the __Department of Health and Human Services__.  NIDDK Website available at https://www.niddk.nih.gov/about-niddk/faqs.

[13] Available at https://www.niddk.nih.gov/health-information/endocrine-diseases/acromegaly

[14] The National Library of Medicine, a part of the federal National Institutes of Health, created and maintains MedlinePlus to assist you in locating authoritative health information.  (available at https://medlineplus.gov/faq/what.html).

[15] Available at https://medlineplus.gov/ency/article/000321.htm

[16] Available at https://stanfordhealthcare.org/medical-conditions/brain-and-nerves/acromegaly.html

[17] Available at http://pituitary.ucla.edu/acromegaly-89

Plf.'s Ex. 5).  The Merck Manual[18] states, "Nerves that carry messages from the eyes to the brain may also be compressed, causing loss of vision, particularly in the outer visual fields. The pressure on the brain may also cause severe headaches."  (<u>Merck Manual - Gigantism and Acromegaly</u>[19], Plf.'s Ex. 5).

Plaintiff is on lifetime calcium replacement therapy.  Plaintiff's calcium levels fluctuate.  Stress like he was experiencing working in the control room can cause Plaintiff to have to take calcium more frequently. (Plf.'s Dep. pp. 55:7-22, 57:12-20; Plf.'s Ex. 2). The Hypoparathyroidism Association[20] states that hypocalcemia is the condition of having low blood calcium.  Causes of hypocalcemia symptoms include anxiety or stressful situations and symptoms include mood changes (such as anxiety, depression, and irritability), cognitive dysfunction ("brain fog" and an inability to concentrate), fatigue or weakness, and dizziness. <u>Hypoparathyroidism Association - Hypocalcemia</u>[21], Plf.'s Ex. 6). Family Practice Notebook[22] states that hypocalcemia symptoms include headache and vomiting.  <u>Family Pracitive Notebook - Hypocalcemia</u>[23], Plf.'s Ex. 6).  WebMD lists hypocalcemia as a condition that causes dizziness, fatigue, increased thirst, and muscle

---

[18] The Manuals are the product of a collaboration between hundreds of medical experts worldwide, an independent editorial board of peer reviewers, and our editorial staff of physicians and professional medical writers. For over 100 years, we have had complete editorial independence to present the best current thinking regarding medical diagnosis and treatment, and do not in any way promote or publicize Merck or MSD products.  (available at https://www.merckmanuals.com/home/resourcespages/about-the-manuals).

[19] Available at https://www.merckmanuals.com/home/hormonal-and-metabolic-disorders/pituitary-gland-disorders/gigantism-and-acromegaly

[20] In 1998, the Association incorporated as a nonprofit, with an all-volunteer board, and became a tax-exempt 501(c)(3) organization.  (available at https://www.hypopara.org/about-us/our-history.html).

[21] Available at https://www.hypopara.org/support-services/newly-diagnosed/what-is-hypocalcemia.html

[22] FPnotebook.com is a rapid access, point-of-care medical reference for primary care and emergency clinicians. (available at https://fpnotebook.com/about.htm).

[23] Available at https://fpnotebook.com/Renal/Calcium/Hypclcm.htm

weakness.  <u>**Web MD - Symptom Checker - Dizziness, Fatigue, Increased Thirst, Muscle Weakness**</u>[24], **Plf.'s Ex. 6).**

In 2012, Plaintiff also took calcitriol, vitamin D, and calcium twice daily.  Plf.'s Decl. ¶ 4, Plf.'s Ex. 1).  RxWiki lists headache, nausea, and vomiting as common side effects of calcitriol.  (<u>**RxWiki - Calcitriol**</u>[25], **Plf.'s Ex. 8).**  WebMD lists headaches, nausea, vomiting, and weakness as potential side effects of calcitriol.  <u>**Web MD - Calcitriol**</u>[26], **Plf.'s Ex. 6).** Plaintiff was also on levothyroxine for his thyroid issue, which MedlinePlus lists side effects of headaches, nausea, and vomiting.  (<u>**MedlinePlus - Levothyroxine**</u>[27], **Plf.'s Ex. 15; Doering Dep. pp. 16:4-8, Plf.'s Ex. 14).**

53.  Dr. Doering testified that motion sickness could not aggravate Plaintiff's calcium deficiency or hypothyroidism conditions. In fact, Plaintiff's calcium level was normal when Dr. Doering saw him on August 2, 2012. *See* Exhibit 4, Doering Deposition at 36-37.

<u>**RESPONSE:**</u> **First, Plaintiff removed him as an expert witness and Dr. Doering explicitly stated that he was not an expert witness and that most of his patients who have had their thyroids removed do not experience the calcium deficiency complications that Plaintiff experienced.  (*See* Doering Dep. p. 12:16-13:5, 23:7-16; Plf.'s Ex. 14;  Plf.'s Fourth Amended Rule 26 Disclosures, Plf.'s Ex. 8).  Defendant responded by listing Doering as an expert witness in amended Rule 26 Disclosures.**

**Second, Dr. Doering stated that he did not know if the symptoms could be related to hypocalcemia, however, he reviewed one of his trusted sources during the deposition and**

---

[24] Available at https://symptomchecker.webmd.com/multiple-symptoms?symptoms=dizziness%7Cfatigue%7Cincreased-thirst%7Cmuscle-weakness&symptomids=81%7C98%7C124%7C290&locations=66%7C66%7C66%7C66
[25] Available at https://www.rxwiki.com/calcitriol
[26] Available at https://www.webmd.com/drugs/2/drug-7448/calcitriol-oral/details
[27] Available at: https://medlineplus.gov/druginfo/meds/a682461.html#side-effects

found that Hypocalcemia can cause vomiting.  (Doering Dep. p. 33:17-19, 34:7-21, Plf.'s Ex. 14).

Third, when Plaintiff went to see Dr. Doering, he told Plaintiff, "The medical conditions you have and the disabilities you have can be exacerbated by certain stimuli." (Plf.'s Dep. pp. 121:9-122:13, Plf.'s Ex. 2; Plf.'s Decl. ¶ 15, Plf.'s Ex. 1).

Fourth, Dr. Doering did not conduct any tests when he saw Plaintiff on August 2, 2012, so he could not know what his calcium levels were that day.

Family Practice Notebook[28] states that hypocalcemia symptoms include headache and vomiting.   Family Pracitive Notebook - Hypocalcemia[29], Family Pracitive Notebook - Acromegaly[30], Plf.'s Ex. 6).

Plaintiff is on lifetime calcium replacement therapy.  Plaintiff's calcium levels fluctuate.  Stress like he was experiencing working in the control room can cause Plaintiff to have to take calcium more frequently. (Plf.'s Dep. pp. 55:7-22, 57:12-20; Plf.'s Ex. 2). The Hypoparathyroidism Association[31] states that hypocalcemia is the condition of having low blood calcium.   Causes of hypocalcemia symptoms include anxiety or stressful situations and symptoms include mood changes (such as anxiety, depression, and irritability), cognitive dysfunction ("brain fog" and an inability to concentrate), fatigue or weakness, and dizziness. Hypoparathyroidism Association - Hypocalcemia[32], Plf.'s Ex. 6). Family Practice Notebook[33] states that hypocalcemia symptoms include headache and

---

[28] FPnotebook.com is a rapid access, point-of-care medical reference for primary care and emergency clinicians. (available at https://fpnotebook.com/about.htm).

[29] Available at https://fpnotebook.com/Renal/Calcium/Hypclcm.htm

[30] Available at https://fpnotebook.com/Endo/Pituitary/Acrmgly.htm

[31] In 1998, the Association incorporated as a nonprofit, with an all-volunteer board, and became a tax-exempt 501(c)(3) organization.  (available at https://www.hypopara.org/about-us/our-history.html).

[32] Available at https://www.hypopara.org/support-services/newly-diagnosed/what-is-hypocalcemia.html

[33] FPnotebook.com is a rapid access, point-of-care medical reference for primary care and emergency clinicians. (available at https://fpnotebook.com/about.htm).

vomiting.   **Family Pracitve Notebook - Hypocalcemia[34]**, Plf.'s Ex. 6).   **WebMD lists hypocalcemia as a condition that causes dizziness, fatigue, increased thirst, and muscle weakness.   Web MD - Symptom Checker - Dizziness, Fatigue, Increased Thirst, Muscle Weakness[35], Plf.'s Ex. 6).**

**In 2012, Plaintiff also took calcitriol, vitamin D, and calcium twice daily.   Plf.'s Decl. ¶ 4, Plf.'s Ex. 1).   RxWiki lists headache, nausea, and vomiting as common side effects of calcitriol.   (RxWiki - Calcitriol[36], Plf.'s Ex. 8).   WebMD lists headaches, nausea, vomiting, and weakness as potential side effects of calcitriol.   Web MD - Calcitriol[37], Plf.'s Ex. 6). Plaintiff was also on levothyroxine for his thyroid/calcium issue, which MedlinePlus lists side effects of headaches, nausea, and vomiting.   (MedlinePlus - Levothyroxine[38], Plf.'s Ex. 15; Doering Dep. pp. 16:4-8, Plf.'s Ex. 14).**

54.   Acromegaly is a benign pituitary tumor that produces excessive growth hormone, for which Plaintiff had surgery to remove the pituitary gland and tumor. Plaintiff's long-term effects from that surgery were hormonal imbalances; however, he was not suffering from any symptoms of any hormonal imbalance when he was seeing Dr. Doering in 2010-2012. *See* Exhibit 4, Doering Deposition at 12, 16.

**RESPONSE: Plaintiff still suffered from those conditions when subjected to certain stimuli, like that found in the control room and Dr. Doering told Plaintiff this.   (Plf.'s Dep. pp. 121:9-122:13, Plf.'s Ex. 2; Plf.'s Decl. ¶ 15, Plf.'s Ex. 1). When Plaintiff went to see Dr.**

---

[34] Available at https://fpnotebook.com/Renal/Calcium/Hypclcm.htm
[35] Available at https://symptomchecker.webmd.com/multiple-symptoms?symptoms=dizziness%7Cfatigue%7Cincreased-thirst%7Cmuscle-weakness&symptomids=81%7C98%7C124%7C290&locations=66%7C66%7C66%7C66
[36] Available at https://www.rxwiki.com/calcitriol
[37] Available at https://www.webmd.com/drugs/2/drug-7448/calcitriol-oral/details
[38] Available at: https://medlineplus.gov/druginfo/meds/a682461.html#side-effects

Doering, he told Plaintiff, "The medical conditions you have and the disabilities you have can be exacerbated by certain stimuli."  (Plf.'s Dep. pp. 121:9-122:13, Plf.'s Ex. 2; Plf.'s Decl. ¶ 15, Plf.'s Ex. 1).  Dr. Doering did not perform any objective tests on Plaintiff when he saw him.


55.  The removal of his pituitary gland and tumor resolved some of the symptoms related to acromegaly, while others persisted. Specifically, acromegaly caused an enlargement of Plaintiff's facial features, head, hands, and feet which persisted after surgery. However, the other symptoms, including headaches, dizziness, vision change, or fatigue, were resolved by the surgery as long as Plaintiff's hormonal imbalance secondary to surgery was being properly treated. *See* Exhibit 4, Doering Deposition at 17-18.

**RESPONSE: The last sentence of this fact is denied to the extent that Plaintiff still suffered from those conditions when subjected to certain stimuli, like that found in the control room and Dr. Doering told Plaintiff this.   Although some of the symptoms of acromegaly subsided after Plaintiff's pituitary tumor was removed, some persisted, such as his enlarged facial features, oversized bone grown, and headaches.   The headaches persisted because the bones do not return to normal size after surgery.   Plaintiff was left with stenosis, which is the narrowing of the spinal canal, that caused nerve irritation and nerve pinching. The overgrowth has also left sharp, jagged vertebrae that have actually nicked his spine causing him neuropathy and nerve pain.   Thos conditions cause Plaintiff continued headaches.   Also, only 10 percent of Plaintiff's pituitary *gland* was removed. (Plf.'s Dep. pp. 121:9-122:13, Plf.'s Ex. 2; Plf.'s Decl. ¶ 3, 15, Plf.'s Ex. 1).**

70.   During this conversation with Plaintiff, Brian Brown asked Plaintiff if he had any recommendation or suggestions to accommodate his motion sickness. In response, Plaintiff stated that he was not asking for a reasonable accommodation, he just could not work in the control room. *See* Exhibit 1, Brian Brown Affidavit, ¶42.

**RESPONSE: Plaintiff denies that he stated he was not asking for a reasonable accommodations.  Plaintiff states that he specifically requested that he not be assigned to the control room as a reasonable accommodations. (Plf.'s Decl. ¶ 17, Plf.'s Ex. 1).**

84.   The Peoria County State's Attorney's Office filed an appearance on behalf of the JDC. Although Superintendent Brian Brown completed the IDHR answer and attended the fact finding conference, the Chief Judge was not included in the IDHR process, and no one with settlement authority for the Chief Judge, the Administrative Office of the Illinois Courts, or the State of Illinois was present or involved in the IDHR process. *See* Exhibit 11, IDHR Correspondence; Exhibit 12, IDHR Investigation Report.

**RESPONSE: First, Plaintiff objects to the allegations that, "no one with settlement authority for the Chief Judge, the Administrative Office of the Illinois Courts, or the State of Illinois was present or involved in the IDHR process", because there is no citation to admissible evidence supporting those allegations. Mr. Brown was the Office of the Chief Judge's superintendent and he drafted, or at least signed, Respondent's response to the charge, questionnaire answers, positions statement, and he appeared at the fact finding conference.   There is no reason to believe that Mr. Brown would not have been vested with settlement authority, and certainly no reason to believe that he would not be reporting**

back to people regarding the charge who did have settlement authority.  Also, those allegations are immaterial as the law discussed in the argument section below does not revolve around whether someone with settlement authority or whether someone from an entity's administrative offices are  "involved in the administrative process."

Second, Plaintiff disputes the statement that "the Chief Judge was not included in the IDHR" process.  He most certainly was.  Mr. Brown acknowledged that the Office of the Chief Judge was his employer.  and that he appeared at the fact finding conference on behalf of the Office of the Chief Judge. (Brown Dep. pp. 87:3-16, 88:18-89:5, 91:1-5; Plf.'s Ex. 3; *see also* Brown Dep. Ex. 6, Plf.'s Ex. 12).  Mr. Brown answered the charge, answered the IDHR questionnaire, the signed the position statement of respondent relating to the charge.  Mr. Brown acknowledged that the IDHR charge listed Peoria County Juvenile Detention Center as the Respondent, that the Peoria County Juvenile Detention Center is just the name of a building, and that the Peoria County Juvenile Detention Center does not employ anyone.  (Brown Dep. pp. 90:21-92:3; Plf.'s Ex. 3; Brown Dep. Ex. 6, Plf.'s Ex. 12; Brown Dep. Ex. 7, Plf.'s Ex. 13; <u>Brown Position Statement</u>, Plf.'s Ex. 8).   Mr. Brown provided substantive information in his response, questionnaire answers, and position statement about Plaintiff's employment and requests for accommodation, but does not mention anywhere in those documents that the Peoria County Juvenile Detention Center is not Plaintiff's employer and he did not make that argument at the fact finding conference, nor did he witness any attorney make that argument.   (Brown Dep. pp. 95:15-97:1; Plf.'s Ex. 3; Brown Dep. Ex. 6, Plf.'s Ex. 12; Brown Dep. Ex. 7, Plf.'s Ex. 13; <u>Brown Position Statement</u>, Plf.'s Ex. 8).

108.   Kramer had assigned Plaintiff to work in the control room prior to 2012. Additionally, when Plaintiff was assigned as a floater, he would provide breaks to the Youth Counselor assigned to the control room. Prior to receiving the doctor's note on August 1, 2012, although Plaintiff made it clear that he did not prefer to work in the control room, he never told Kramer that he was unable to perform the duties in the control room or that he was suffering any symptoms as a result of working the control room. Kramer also never saw anything that would suggest that Plaintiff was unable to perform the duties in the control room.

**RESPONSE:**  **Plaintiff admits this fact except for the last sentence, which is vague. To the extent that Ms. Kramer is alleging that she never saw anything that would indicate that Plaintiff was incompetent to run the control room or entirely incapable for even short periods of time, Plaintiff admits the allegation.  To the extent that Ms. Kramer is alleging that she never witnessed Plaintiff struggle or become sick working in the control room. Plaintiff was assigned to the control room in 2011 by Ms. Kramer.  She observed how it was affecting Plaintiff and said, "Get out of here. You know how to do that."  (Plf.'s Dep. p. 56, 120:7-19, Plf.'s Ex. 2; Plf.'s Decl ¶ 12, Plf.'s Ex. 1). On July 29, 2012, Ms. Kramer approached Plaintiff and said, "I've got some bad news. Brian's making me put you in control, and I know it makes you sick, but I can't get out of it."  Ms.  Kramer apologized for making Plaintiff do this, but reported she had no choice.  The room made Plaintiff physically ill, with symptoms of light headedness, headache, ear pain, neck pain, drained my energy, and caused pain in his eyes. (Plf.'s Dep. p. 119:3-7, Plf.'s Ex. 2; Plf.'s Decl. ¶ 14, Plf.'s Ex. 1).**

### iii.   __Disputed Immaterial Facts__

26.  Although all Youth Counselors were expected to be able to perform the duties for all assignments, that was not always the case in practice. For example, when it was necessary to have a third shift Youth Counselor work on the first shift (to cover for an absent employee), it would reveal the fact that the third shift Youth Counselor did not know how to perform the floater or control room duties. Additionally, at times, a Youth Counselor who was typically assigned to the control room was absent (due to illness or vacation) and the Youth Counselor assigned to replace the absent employee in the control room would state that he or she did not know how to perform the required duties. Similarly, at times, a Youth Counselor who was regularly assigned to the control room would be assigned to a living unit, but would state that he or she did not know how to perform the duties associated with the living unit. *See* Exhibit 1, Brian Brown Affidavit, ¶26.

__RESPONSE: The allegation that "all Youth Counselors were expected to be able to perform the duties for all assignments" is denied because, prior to the occasions Plaintiff was assigned to the control room giving rise to this lawsuit, he had in the control room only 5 days in 13 years, and that was because he was assigned to light duty due to a work related injury.  (Plf.'s Dep. at pp. 206:12-207: 4, , Plf.'s Ex. 2).  The remainder of this fact is immaterial as Defendant makes no allegation that Plaintiff did not know how to work the control room, thus Defendant's allegation that other individuals needed training does not bear directly on the legal issue of whether Defendant failed to provide Plaintiff with a reasonable accommodation or failed to engage him in an interactive process.__

78.  In response to the question regarding whether it was correct that Plaintiff was unable

to perform the physical requirements that were circled, Dr. Doering wrote, "Yes, this is correct." *See* Exhibit 7, FMLA Clarification; Exhibit 4, Doering Deposition at 67-68.

**RESPONSE:** **Denied.  Dr. Duering clarified in his deposition that he was stating that it was correct, but only for the control room setting.  (Doering Dep. pp.67:9-68:10, Plf.'s Ex. 14).  That page also has circled various statements limiting the restrictions to the control room.  *See* FMLA Clarification, Def.'s Ex. 7.  This fact is also immaterial as the events that transpired after Plaintiff was forced on medical leave have nothing to do with whether Plaintiff is a qualified individual with a disability or whether Defendant failed to provide Plaintiff with a reasonable accommodation and failed to engage him in an interactive process, which are all issues that fully developed prior to the FMLA certification documentation.**

### iv.    Undisputed Immaterial Facts

15.  Each Unit has a similar physical layout. There is a central common area that includes a desk and monitors where the Youth Counselor completes reports. Separated from the common area, but visible from the Youth Counselor's desk, there is a day room which the juveniles' rooms open into. When juveniles are in their rooms, in order to perform the 15 minute visual checks, the Youth Counselor must leave the common area and walk to the door of each juveniles' room.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial.  The central issues in this case revolve around Plaintiff's disability, his request for accommodations, failure to engage him in an interactive process, and details of the control room and the control room assignment; not the layout of juvenile rooms or common areas.**

Regarding the photos that are included with this fact, Plaintiff denies that they are an accurate depiction of a room as it existed 6 years before the photos were taken.  This alleged fact does not specify when the photos were taken, or by whom, but it may be inferred that the photos are recent by the fact that Mr. Brown acknowledges that there "is a computer monitor present in one of the photos that was not present in 2012".  (Brown Decl. at ¶17, Def.'s Ex. 1).  Plaintiff further objects to the inclusion of these photos on grounds of relevance and because they may be more prejudicial than probative as they unfairly depict every minute detail of a room that simply does not depict the details of the room as they existed 6 years earlier.

18.  There are several rooms at the Peoria County JDC used to educate the juvenile detainees. Most of these rooms have desks for the students, a desk for the instructor, and a seat for the Youth Counselor. *See* Exhibit 1, Brian Brown Affidavit, ¶18; Exhibit 1-E, Pictures of Educational Room.

**RESPONSE:** While Plaintiff does not dispute the written portion of this fact, it is immaterial.  The central issues in this case revolve around Plaintiff's disability, his request for accommodations, failure to engage him in an interactive process, and details of the control room and the control room assignment; not the layout of classrooms.

Regarding the photos that are included with this fact, Plaintiff denies that they are an accurate depiction of a room as it existed 6 years before the photos were taken.  This alleged fact does not specify when the photos were taken, or by whom, but it may be inferred that the photos are recent by the fact that Mr. Brown acknowledges that there was no smart board (large white board on the wall in one of the photos) in the room in 2012,

that the photos were taken in 2018, just like the other photos.  (Brown Decl. at ¶18, Def.'s Ex. 1).  Plaintiff also states that these rooms were painted solid white in 2012.  (Plf.'s Decl. at ¶ 10, Plf.'s Ex. 1).  Regardless, proper foundation for these photos has not been laid to admit them as evidence.   Plaintiff further objects to the inclusion of these photos on grounds of relevance and because they may be more prejudicial than probative as they unfairly depict every minute detail of a room that simply does not depict the details of the room as they existed 6 years earlier.

21.   One educational room, the computer lab, has a different setup. This room contains eight computers stations for juveniles, a printer, a chair for the Youth Supervisor, and a dry erase board. An instructor will also be present in the computer lab. *See* Exhibit 1, Brian Brown Affidavit, ¶21; *See* Exhibit 1-F, Pictures of Computer Lab.

**RESPONSE: While Plaintiff does not dispute the written portion of this fact, it is immaterial.  The central issues in this case revolve around Plaintiff's disability, his request for accommodations, failure to engage him in an interactive process, and details of the control room and the control room assignment; not the layout of a computer  lab.**

**Regarding the photos that are included with this fact, Plaintiff denies that they are an accurate depiction of a room as it existed 6 years before the photos were taken.  This alleged fact does not specify when the photos were taken, or by whom, but it may be inferred that the photos are recent and were taken contemporaneously with the photos that Defendant admits were taken in 2018.  (*See* Def.'s Memorandum in Supp. of Mot. for Summary Judgment at p. 5, FN 2, Dkt. No. 34).  Regardless, proper foundation for these photos is not laid for admission into evidence.  Plaintiff also objects to the inclusion of these**

**photos on grounds of relevance and because they may be more prejudicial than probative as they unfairly depict every minute detail of a room that simply does not depict the details of the room as they existed 6 years earlier.**

20.  The educational rooms are all generally similar in size and setup. The room depicted above is 13' by 22'.

**<u>RESPONSE:</u> While Plaintiff does not dispute the written portion of this fact, it is immaterial.  The central issues in this case revolve around Plaintiff's disability, his request for accommodations, failure to engage him in an interactive process, and details of the control room and the control room assignment; not the layout of the classrooms.**

22.  The computer lab is 11' by 24'8". *See* Exhibit 1, Brian Brown Affidavit, ¶22.

**<u>RESPONSE:</u> While Plaintiff does not dispute the written portion of this fact, it is immaterial.  The central issues in this case revolve around Plaintiff's disability, his request for accommodations, failure to engage him in an interactive process, and details of the control room and the control room assignment; not the layout of the computer lab.**

28.  In June 2010, Peoria County received a complaint from JDC Youth Counselor Chris Billingsley that Detention Supervisor Ryan Breedlove, who supervised the swing shift, was not fairly assigning Youth Supervisors to the three possible assignments. Specifically, Billingsley complained that he was unfairly assigned to be a floater for three weeks in a row even though he did not prefer that task. In interviews conducted by Peoria County while investigating this complaint, other employees complained that the control room was not being fairly assigned

either. *See* Exhibit 1, Brian Brown Affidavit, ¶23; Exhibit 1-G, Peoria County Investigation.

**RESPONSE:** **First, Plaintiff objects to the allegation that "other employees complained that the control room was not being fairly assigned either" as being vague and ambiguous (i.e. was the complaint motivated by individuals who wanted the control room assignment, or who did not want the control room assignment?; what shift were the other employees who complained on?).  Second, while Plaintiff is not in possession of admissible evidence to dispute the allegations contained in this fact, it is immaterial as it does not bear directly on the legal issue of whether Defendant failed to provide Plaintiff with a reasonable accommodation when he requested not to work the control room.  Again, there is no information that the other individuals who complained during the investigation worked Plaintiff's shift.  Presumably, since the original complaint was that swing shift supervisor was not fairly assigning assignments, then the individuals who were questioned during the investigation would have also been on the swing shift, which would have zero bearing on why Plaintiff could not be excused from working the control room.  Similarly, there is no information about whether the individuals were complaining that they were being assigned to the control room too much, or too little.  If it was the latter, this would have zero bearing on why Plaintiff could not be excused from working the control room, regardless of what shift the individual worked on.**

56.  In his complaint and charge of discrimination, Plaintiff claimed that his disabilities were hypothyroidism with calcium deficiency and pituitary tumor with acromegaly, but when asked what his conditions prevented him from doing, he stated he could not answer the question. Upon further questioning, Plaintiff admitted that he was able to work, walk, breathe, care for

himself, pick things up as long as they are not too small, drive, see, hear, eat, walk, stand, lift, bend, speak, learn, read, concentrate, and communicate. *See* Exhibit 2, Youngman Deposition at 81-83, 86-88.

**RESPONSE: While Plaintiff admits that this was his testimony during his deposition, it is immaterial as that it does not end the discussion as to whether he was disabled.  Further, there were numerous objections made to form due to questions being vague.[39]**

57.  Dr. Doering's diagnosis of motion sickness was based on the subjective statements of Plaintiff. *See* Exhibit 4, Doering Deposition at 50-51.

**RESPONSE: This is immaterial as Dr. Doering's diagnosis being based upon subjective statements or objective measurements/observations has no bearing on whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

58.  Dr. Doering testified that he did not know if the lights in the control room were any different than any of the lights in the other areas of Plaintiff's workplace and that it was possible that lights in other areas of Plaintiff's workplace could cause the same symptoms he experienced in the control room. *See* Exhibit 4, Doering Deposition at 61-62.

---

[39] *See* Plf.'s Dep. 86:19-87:19, Plf.'s Ex. 2: "Q. You can walk?  A. Yeah.  Q. You can stand?  A. Yeah.  Q. You can lift?  MR. McCANN: Form. It's an untimely objection, but form to those last three questions.  Q. Can you lift things?  A. Some things.  Q. Can you bend?  MR. McCANN: Form.  A. With pain, yeah.  Q. Okay. Can you speak?  MR. McCANN: Form.  A. Yes.  Q. Can you breathe?  MR. McCANN: Form.  A. Somewhat, yes.  Q. Do you have problems learning?  A. No.  Q. Can you read?  MR. McCANN: Form.  A. Yes.  Q. Can you concentrate?  MR. McCANN: Form."

**RESPONSE: Dr. Doering's assessment of lights he was not familiar with or whether there could be lights in areas other than the control room that affected Plaintiff has no bearing on whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

59.  Dr. Doering testified that he did not know if there are computer monitors in any areas of Plaintiff's workplace besides the control room. *See* Exhibit 4, Doering Deposition at 61-62.

**RESPONSE: Dr. Doering's knowledge about computer monitors around Plaintiff's workplace has no bearing on whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

60.  Dr. Doering testified that he did not know if there was noise in any areas of Plaintiff's workplace besides the control room. *See* Exhibit 4, Doering Deposition at 62.

**RESPONSE: Dr. Doering's knowledge about noise around Plaintiff's workplace has no bearing on whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

61.  When Dr. Doering stated that the noise in the control room caused Plaintiff's motion sickness, he did not know what noise was the issue. In other words, he did not know what "noise in the control room" meant. *See* Exhibit 4, Doering Deposition at 65.

36

**RESPONSE: Dr. Doering's knowledge about noise in the control room has no bearing on whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

62.   Dr. Doering testified that he could not say if Plaintiff would experience motion sickness when monitoring juveniles in the computer lab with eight computer monitors present. *See* Exhibit 4, Doering Deposition at 64-65.

**RESPONSE: Dr. Doering's knowledge about whether Plaintiff would experience motion sickness in the computer lab has no bearing on whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

63.   Dr. Doering testified that several treatments are available for motion sickness, including medication, patient education (teaching to use focus points in a moving car), and habituation (through repeated exposure). However, none of these available treatments were used for Plaintiff's motion sickness. *See* Exhibit 4, Doering Deposition at 52, 55-56.

**RESPONSE: Treatments available for motion sickness have no bearing on whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

64.   According to Dr. Doering, Plaintiff could have taken Dramamine to be able to work

the control room. Dramamine is a medication used to treat motion sickness, which Plaintiff reported having taken without side effects. *See* Exhibit 4, Doering Deposition at 51-52.

**RESPONSE: Medications available for motion sickness have no bearing on whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

85.  Plaintiff submitted updates of his condition of motion sickness in March and April of 2013. Each update stated that he could not perform any duties in the control room, and that the duration of the "disability" is permanent. *See* Exhibit 8, Medical Updates September 2012-April 2013.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial.  The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

86.  On April 30, 2013, Plaintiff started a new job, but he did not inform anyone at the JDC that he had new employment. *See* Exhibit 2, Youngman Deposition at 168, 170.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial.  The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

87.   Plaintiff did not provide any updates regarding his medical condition(s) after obtaining new employment. *See* Exhibit 2, Youngman Deposition at 174.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial.  The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

88.   On August 7, 2013, Superintendent Brown wrote a letter to Plaintiff stating that Plaintiff had not submitted an update on his condition since April 17, 2013 and, as a result, he was not in compliance with the medical leave requirements. Brown directed Plaintiff to present the required information no later than August 23, 2013. This letter was sent by certified mail and was shown as "delivered" on August 13, 2013. *See* Exhibit 1, Brian Brown Affidavit, ¶46; Exhibit 1-X, Letters requesting information from Youngman, at 1-2.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial.  The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

89.   On August 22, 2013, Brown received a letter from Plaintiff, in which Plaintiff stated that "[he has] been able to perform [his] essential job duties all along, and did so, even in the Control Center, until [Brown] forced [him] on medical leave . . . ." Plaintiff then states that he can work with the simple accommodation of being outside of the control room. *See* Exhibit 1, Brian Brown Affidavit, ¶47; Exhibit 1-Y, Letter from Youngman; Exhibit 2, Youngman

Deposition at 172.

RESPONSE: **While Plaintiff does not dispute this fact, it is immaterial. The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

90.   On August 26, 2013, Superintendent Brown sent a letter to Plaintiff via certified mail, stating that he was directed to submit the required medical verification or an authorization to return to work no later than August 23, 2013, but neither had been received. Brown stated that Plaintiff's conduct was insubordinate and directed Plaintiff to meet with Brown on August 28, 2013 at 11:30 a.m. to respond to the charge of insubordination. In the alternative to discipline, Plaintiff was given the option to submit the paperwork previously requested. Delivery of the letter was attempted on August 27, 2013; however, it was not delivered that day, but a notice was left. *See* Exhibit 1, Brian Brown Affidavit, ¶48; Exhibit 1-X, Letters requesting information from Youngman, at 3-4; Exhibit 2, Youngman Deposition at 173.

RESPONSE: **While Plaintiff does not dispute this fact, it is immaterial. The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

91.   On August 27, 2013, Superintendent Brown received a call from Plaintiff's wife, who stated that Plaintiff was unavailable on August 28, 2013. *See* Exhibit 1, Brian Brown Affidavit, ¶49; Exhibit 2, Youngman Deposition at 173.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial. The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

92. On August 27, 2013, Superintendent Brown sent a letter to Plaintiff stating that it had come to Brown's attention that Plaintiff would be unable to attend a meeting on August 28, 2013 and rescheduled the meeting for August 30, 2013. Again, Plaintiff was given the option to submit the requested paperwork rather than face discipline. *See* Exhibit 1, Brian Brown Affidavit, ¶50; Exhibit 1-X, Letters requesting information from Youngman, at 5-8.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial. The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

93. The August 27, 2013 letter was sent via certified mail, and delivery was attempted on August 28, 2013. However, the letter was not delivered that day, but a notice was left. *See* Exhibit 1, Brian Brown Affidavit, ¶50; Exhibit 1-X, Letters requesting information from Youngman, at 5-8.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial. The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

41

94.   On August 29, 2013, Superintendent Brown spoke with Mike Stewart, a union representative, who stated that he (Mike) spoke with Plaintiff and informed him of the meeting on August 30, 2013. *See* Exhibit 1, Brian Brown Affidavit, ¶51.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial.  The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

95.   Plaintiff did not attend the August 30, 2013 meeting. *See* Exhibit 1, Brian Brown Affidavit, ¶52.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial.  The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

96.   On September 6, 2013, Superintendent Brown called Plaintiff's cellphone and left a message asking about his availability to meet during the week of September 9, 2013 through September 13, 2013. Brown stated in his message that, if he did not hear from Plaintiff, he would schedule the meeting for September 13, 2013 at 10:00 a.m. *See* Exhibit 1, Brian Brown Affidavit, ¶53.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial.  The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable**

**accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

97.    On September 6, 2013, Superintendent Brown sent a letter to Plaintiff stating Brown's attempts to get in touch with Plaintiff to obtain the required medical paperwork. Brown directed Plaintiff to meet with him on September 13, 2013, or submit the requested documents. The letter was sent via certified mail and delivery was attempted (but was unsuccessful) on September 7, 2013. *See* Exhibit 1, Brian Brown Affidavit, ¶54; Exhibit 1-X, Letters requesting information from Youngman, at 9-13.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial. The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

98.    On September 6, 2013, Dan Hunt received a call from Plaintiff's wife, who stated that they were not going to meet with Superintendent Brown. *See* Exhibit 1, Brian Brown Affidavit, ¶55.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial. The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

99.    Plaintiff did not attend the September 13, 2013 meeting. *See* Exhibit 1, Brian Brown Affidavit, ¶55; *See* Exhibit 2, Youngman Deposition at 174-75.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial.  The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

100.   On September 13, 2013, Superintendent Brown sent a fifth letter to Plaintiff, reiterating his numerous attempts to either meet with Plaintiff or for Plaintiff to submit the required medical documentation. Brown directed Plaintiff to meet with him on September 20, 2013 to respond to the allegation of insubordination. *See* Exhibit 1, Brian Brown Affidavit, ¶56; Exhibit 1-X, Letters requesting information from Youngman, at 14-15.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial.  The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

101.   Rather than send the September 13, 2013 letter via certified mail, the letter was given to Mike Hirsh, an investigator for the State's Attorney's Office, to personally serve Plaintiff. The investigator reached Plaintiff by phone, and arrangements were made to meet. However, approximately ten minutes later, Plaintiff called the investigator and stated he would not meet with him. The investigator read the first page of the letter to Plaintiff, and then advised Plaintiff that the next meeting was set for September 20, 2013. *See* Exhibit 1, Brian Brown Affidavit, ¶56-57; Exhibit 1-Z, Investigator Report; *See* Exhibit 2, Youngman Deposition at 175-78.

44

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial. The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

102.   Plaintiff did not attend the September 20, 2013 meeting. *See* Exhibit 1, Brian Brown Affidavit, ¶56.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial. The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

103.   On September 29, 2013, a facsimile was received from Plaintiff, which stated "[e]ffective immediately, if I am still considered an active employee, I announce my resignation from Peoria County." *See* Exhibit 1, Brian Brown Affidavit, ¶59; Exhibit 1-AA, September 29, 2013 Facsimile from Youngman; *See* Exhibit 2, Youngman Deposition at 178.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial. The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

104.   Plaintiff's resignation was not accepted. Instead, he was terminated on October 1, 2013 due to insubordination. *See* Exhibit 1, Brian Brown Affidavit, ¶60; Exhibit 1-BB,

Disciplinary Decision.

**RESPONSE: While Plaintiff does not dispute this fact, it is immaterial. The events that transpired in 2013 have nothing to do with whether Plaintiff is a qualified individual with a disability, whether Defendant failed to provide Plaintiff with a reasonable accommodation, or whether Defendant failed to engage Plaintiff in an interactive process.**

     v.    **Plaintiff's Statement of Additional Facts**

1.     Plaintiff's disabilities are pituitary tumor with acromegaly and hypothyroidism with chronic calcium deficiency (otherwise known as hypocalcemia) and the resulting effects of those conditions. (Plf.'s Dep. pp. 82:2-5; Plf.'s Ex. 2; Plf.'s Decl. ¶ 2, Plf.'s Ex. 1).

2.     Specifically, Plaintiff was diagnosed with a pituitary tumor in late December of 1993. In Plaintiff's particular case, he experienced acromegaly symptoms including headaches, chest pain, fatigue, sporadic heart arthymias, changing physical features (structural bones in hands, feet, head, and body continually growing, organs continually growing, low testosterone, back pain, excessive sweating, several ear infections). His pituitary tumor and 10% of his pituitary gland removed 3/2/1994. (Plf.'s Decl. ¶ 3, Plf.'s Ex. 1).

3.     Plaintiff's endocrinologist explained at the time that the effects of the tumor would likely be all-encompassing as almost every system in his body was affected from the tumor and resulting acromegaly. Plaintiff's condition would likely cause him to suffer from heart issues, thyroid issues, kidney issues, 50%-70% greater chance of colon cancer, arthritis due to massive boney overgrowth, neuropathy of limbs, possible vision problems and auditory problems. (Plf.'s Decl. ¶ 3, Plf.'s Ex. 1).

4.     Most of these problems affect him on a daily basis. He is on medication to control

a heart arrhythmia (otherwise known as supraventricular tachacardia svt, or "SVT"). He has been diagnosed with arthritis, suffers from regular headaches and ear problems, has had precancerous polyps removed from his colon in 2011, and is on medications for acromegaly and related ailments, such as metoprolol for the SVT control (with side effects of dizziness/lightheadedness, tiredness, headaches, nausea, stomach pain), flecanide for the SVT (with side effects of dizziness, headaches, anxiety, vision problems, nausea, numbness and tingling). Plaintiff also has an aortic root aneurysm on his heart and every 6 months has to have a CAT scan and echocardiogram to monitor the size and change of the aneurysm. (Plf.'s Decl. ¶ 3, Plf.'s Ex. 1).

5. Regarding Plaintiff's hypothyroidism, Plaintiff's thyroid gland had become overgrown due to the acromegaly, which was wrapping around his windpipe and starting to choke him. Plaintiff underwent a total thyroidectomy in November of 2011, resulting in hypothyroidism. After having his thyroid removed, Plaintiff was required to be on lifetime calcium replacement therapy including calcitriol, vitamin D, and calcium twice daily. Plaintiff's calcium levels fluctuate and stress like he was experiencing working in the control room can cause Plaintiff to have to take calcium more frequently. He was in the hospital twice for "calcium dumps", or low calcium. (Plf.'s Dep. pp. 55:7-22, 56:1-8, 57:12-20, 57:24-58:1; Plf.'s Ex. 2; Plf.'s Decl. ¶ 4, Plf.'s Ex. 1).

6. In Plaintiff's particular case, he experiences symptoms of hypocalacemia (low calcium) including include confusion, fatigue, muscle cramping and weakness, numbness and tingling, dizziness, tunnel vision (feeling of blacking out), anxiety, and headache. While these symptoms are typically controlled with calcium supplements, they can be exacerbated by stress and my calcium levels are hard to control. (Plf.'s Decl. ¶ 4, Plf.'s Ex. 1).

7.      Plaintiff's symptoms of hypothyroidism include tiredness, low energy, difficulty thinking and focusing, poor memory, slower speech and movement.  (Plf.'s Decl. ¶ 4, Plf.'s Ex. 1).

8.      Plaintiff went to the emergency room in December of 2012 with symptoms of numbness and tingling, buzzing feeling from head to toe, confusion, vision issues, and headache.  Plaintiff was diagnosed with severe low calcium levels at that time and was in the ER for 10-12 hours getting IV replacements of calcium, magnesium, potassium, and sodium. (Plf.'s Decl. ¶ 4, Plf.'s Ex. 1).

9.      Plaintiff again went to the ER in February of 2012 with symptoms of numbness, tingling, confusion, headaches, vision issues.  The diagnosis was, again, severe low calcium levels.  That time Plaintiff was admitted to the hospital for 3 days of IV infusions of calcium, magnesium, potassium, and sodium.  Plaintiff was also checked for kidney and heart damage due to severity of symptoms. (Plf.'s Decl. ¶ 3, Plf.'s Ex. 1).

10.     Dr. Doering testified that acromegaly can cause someone to experience more headaches and can certainly have the big physical findings of larger head, larger hands, larger feet.  (Doering Dep. p. 12:16-13:2, Plf.'s Ex. 14).

11.     Dr. Doering testified that Family Practice Notebook is one of two primary sources he uses when researching medical conditions and that it is a common source used amongst family doctors.  (Doering Dep. p. 13:15-14:8, Plf.'s Ex. 14).  Family Practice Notebook[40] states acromegaly symptoms include headache.  Family Pracitve Notebook - Acromegaly[41], Plf.'s Ex. 6).

12.     Dr. Doering testified that the Mayo Clinic as a trusted source in the medical

---

[40] FPnotebook.com is a rapid access, point-of-care medical reference for primary care and emergency clinicians. (available at https://fpnotebook.com/about.htm).
[41] Available at https://fpnotebook.com/Endo/Pituitary/Acrmgly.htm

profession with top notch doctors who do top notch research.  (Doering Dep. p. 69:19-70:4, Plf.'s Ex. 14).  The Mayo Clinic states, "Acromegaly is a hormonal disorder that develops when your pituitary gland produces too much growth hormone during adulthood. When this happens, your bones increase in size, including those of your hands, feet and face. Acromegaly usually affects middle-aged adults."  Acromegaly can cause, fatigue and muscle weakness, a deepened, husky voice due to enlarged vocal cords and sinuses, severe snoring due to obstruction of the upper airway, impaired vision, headaches, enlarged liver, heart, kidneys, spleen and other organs, and increased chest size (barrel chest).  (Mayo Clinic - Acromegaly - Symptoms and Causes[42], Plf.'s Ex. 5).

13.     The National Institute of Diabetes and Digestive and Kidney Diseases[43] also lists fatigue and weakness, headaches, and impaired vision as Acromegaly symptoms.  (NIDDK - Acromegaly[44], Plf.'s Ex. 5).  Medline Plus[45] lists "easy fatigue . . . decreased peripheral vision . . . headache" as symptoms of Acromegaly.  (MedlinePlus - Acromegaly[46], Plf.'s Ex. 5).  Stanford Healthcare also lists headaches and dizziness as symptoms.  (Stanford Healthcare - Acromegaly[47], Plf.'s Ex. 5). UCLA Pituitary Tumor Program also lists headaches as symptoms of Acromegaly.  (UCLA Pituitary Tumor Program - Acromegaly[48], Plf.'s Ex. 5).  The Merck Manual[49] states, "Nerves that carry messages from the eyes to the brain may also be compressed,

---

[42] Available at https://www.mayoclinic.org/diseases-conditions/acromegaly/symptoms-causes/syc-20351222
[43] The National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK) is part of the National Institutes of Health (NIH), the nation's medical research agency. We conduct and support biomedical research, disseminating research findings and health information to the public, and are part of the U.S. government under the Department of Health and Human Services.  NIDDK Website available at https://www.niddk.nih.gov/about-niddk/faqs.
[44] Available at https://www.niddk.nih.gov/health-information/endocrine-diseases/acromegaly
[45] The National Library of Medicine, a part of the federal National Institutes of Health, created and maintains MedlinePlus to assist you in locating authoritative health information.  (available at https://medlineplus.gov/faq/what.html).
[46] Available at https://medlineplus.gov/ency/article/000321.htm
[47] Available at https://stanfordhealthcare.org/medical-conditions/brain-and-nerves/acromegaly.html
[48] Available at http://pituitary.ucla.edu/acromegaly-89
[49] The Manuals are the product of a collaboration between hundreds of medical experts worldwide, an independent editorial board of peer reviewers, and our editorial staff of physicians and professional medical writers. For over 100

causing loss of vision, particularly in the outer visual fields. The pressure on the brain may also cause severe headaches." (<u>Merck Manual - Gigantism and Acromegaly</u>[50], Plf.'s Ex. 5).

14.     Although some of Plaintiff's symptoms of acromegaly subsided after Plaintiff's pituitary tumor was removed, some persisted, such as his enlarged facial features, oversized bone grown, and headaches.  The headaches persisted because the bones do not return to normal size after surgery.   Plaintiff was left with stenosis, which is the narrowing of the spinal canal, that caused nerve irritation and nerve pinching. The overgrowth has also left sharp, jagged vertebrae that have actually nicked his spine causing him neuropathy and nerve pain.   Thos conditions cause Plaintiff continued headaches.  (Plf.'s Decl. ¶ 3, 15, Plf.'s Ex. 1).

15.     Dr. Kaslow[51] states on his website that hypothyroidism's symptoms include, "fatigue, headaches and migraines, dizziness or lightheadedness, anxiety/panic attacks, and fluid in the ears, etc." (<u>Dr. Kaslow - Hypothyroidism</u>[52], Plf.'s Ex. 7).  The Merck Manual states that symptoms of hyphothyroidism include fatigue, tingling of hands and feet, confusion, and forgetfulness.  (<u>Merck Manual - Hypothyroidism</u>[53], Plf.'s Ex. 7).  Medline Plus, The National Institute of Diabetes and Digestive and Kidney Diseases, and NIH Magazine all list fatigue as a

---

years, we have had complete editorial independence to present the best current thinking regarding medical diagnosis and treatment, and do not in any way promote or publicize Merck or MSD products.  (available at https://www.merckmanuals.com/home/resourcespages/about-the-manuals).
[50] Available at https://www.merckmanuals.com/home/hormonal-and-metabolic-disorders/pituitary-gland-disorders/gigantism-and-acromegaly
[51] Dr. Kaslow earned his Medical Degree from the University of California at Los Angeles in 1984.  After completing a 3-year internship and residency in Primary Care  Medicine, Dr. Kaslow completed a 2 year Fellowship in Immunology and Allergy for Adults and Children at the University of California at Irvine in 1989.  He has been in private practice providing direct patient care since and has participated in the following appointments: Assistant Clinical Professor of Medicine, University of California at Irvine 1989-1997; Past Chairman, Bioethics Committee, Irvine Medical Center; Chairman, Medical Staff Aid Committee, Garden Grove Hospital & Medical Center 2000-2002; Chairman, Department of Medicine, Garden Grove Medical Center (1996-1997); Medical Executive Committee, Garden Grove Medical Center (1996-1997); Saint Joseph Sinus Center faculty; Board member and President, International Foundation of Health and Nutrition; Chairman, Orange County Academy of Internal Medicine (1996-1997); Qualified Medical Evaluator, State of California (-2000).  Available at: http://www.drkaslow.com/html/staff/dr-jeremy-e-kaslow.html
[52] Available at: http://www.drkaslow.com/html/staff/dr-jeremy-e-kaslow.html
[53] Available at: https://www.merckmanuals.com/home/hormonal-and-metabolic-disorders/thyroid-gland-disorders/hypothyroidism

condition caused by hypothyroidism.  (Medline Plus - Hypothyroidism[54], NIH Magazine - Hypothyroidism[55], NIDDK - Hypothyroidism[56], Plf.'s Ex. 7).

16.     The Hypoparathyroidism Association[57] states that hypocalcemia is the condition of having low blood calcium.  Causes of hypocalcemia symptoms include anxiety or stressful situations and symptoms include mood changes (such as anxiety, depression, and irritability), cognitive dysfunction ("brain fog" and an inability to concentrate), fatigue or weakness, and dizziness. Hypoparathyroidism Association - Hypocalcemia[58], Plf.'s Ex. 6). Family Practice Notebook states that hypocalcemia symptoms include headache and vomiting.  Family Pracitice Notebook - Hypocalcemia[59], Plf.'s Ex. 6).  WebMD lists hypocalcemia as a condition that causes dizziness, fatigue, increased thirst, and muscle weakness.  Web MD - Symptom Checker - Dizziness, Fatigue, Increased Thirst, Muscle Weakness[60], Plf.'s Ex. 6).

17.     In 2012, Plaintiff took calcitriol, vitamin D, and calcium supplements twice a day for his hypocalcemia.  Plf.'s Decl. ¶ 4, Plf.'s Ex. 1.  RxWiki lists headache, nausea, and vomiting as common side effects of calcitriol.  (RxWiki - Calcitriol[61], Plf.'s Ex. 8).  WebMD lists headaches, nausea, vomiting, and weakness as potential side effects of calcitriol.  Web MD - Calcitriol[62], Plf.'s Ex. 6).

18.     Plaintiff was also on levothyroxine for his thyroid issue in 2012, which can cause

---

[54] Available at: https://medlineplus.gov/hypothyroidism.html
[55] Available at: https://medlineplus.gov/magazine/issues/spring12/articles/spring12pg24-25.html
[56] Available at: https://www.niddk.nih.gov/health-information/endocrine-diseases/hypothyroidism
[57] In 1998, the Association incorporated as a nonprofit, with an all-volunteer board, and became a tax-exempt 501(c)(3) organization.  (available at https://www.hypopara.org/about-us/our-history.html).
[58] Available at https://www.hypopara.org/support-services/newly-diagnosed/what-is-hypocalcemia.html
[59] Available at https://fpnotebook.com/Renal/Calcium/Hypclcm.htm
[60] Available at https://symptomchecker.webmd.com/multiple-symptoms?symptoms=dizziness%7Cfatigue%7Cincreased-thirst%7Cmuscle-weakness&symptomids=81%7C98%7C124%7C290&locations=66%7C66%7C66%7C66
[61] Available at https://www.rxwiki.com/calcitriol
[62] Available at https://www.webmd.com/drugs/2/drug-7448/calcitriol-oral/details

headaches, nausea, and vomiting.  (<u>MedlinePlus - Levothyroxine</u>[63], Plf.'s Ex. 15).

19.     Plaintiff and Mr. Brown used to work together when Mr. Brown was a Youth Counselor before he got promoted.  Plaintiff told Mr. Brown about his acromegaly and its side effects at that time.  Also, regarding the hypothyroidism, Plaintiff personally told Mr. Brown about that when he went to his office to tell him that he was having his thyroid taken out and he needed three weeks of FMLA.  Plaintiff also called in sick from the hospital when he had his calcium dump and spoke with Ms. Kramer.  (Plf.'s Dep. pp. 77:10-78:4, 209:9-24; Plf.'s Ex. 2; Brown Dep. pp. 17:23-18:5, Plf.'s Ex. 3).

20.     Mr. Brown also admits in his position statement to the Illinois Department of Human Rights, "At various times in the course of his employment Complainant did discuss with various individuals pituitary and thyroid issues generally . . . ." (<u>Brown Position Statement</u>, Plf.'s Ex. 11).  Mr. Brown also stated during his deposition that he was aware Plaintiff had a pituitary tumor, that it was "common knowledge", and that he openly discussed his pituitary issue with coworkers and management. (Brown Dep. pp. 18:11-19:13, Plf.'s Ex. 3).

21.     Mr. Brown also received and read Plaintiff's medical leave request stating it was for a thyroidectamy.  (Brown Dep. p. 21:3-22, Plf.'s Ex. 3).

22.     Mr. Brown acknowledged that Plaintiff's physical appearance is different than most people and he has "a large head and he's rather tall, he's big, has a protruding forehead." (Brown Dep. p. 118:14-22, Plf.'s Ex. 3).

23.     When Plaintiff went to the hospital for low calcium, his skin and extremities started to buzz or tingle like pins and needles, he got tunnel vision, and became dizzy.  Kidney failure, rapid heartbeat, and possibly death could occur if he does not get IV replacement.   On the two occasions that Plaintiff went to the hospital, he could not have thought clearly, probably

---

[63] Available at: https://medlineplus.gov/druginfo/meds/a682461.html#side-effects

could not have walked half a block on his own, could not have meaningfully socialized due to loss of cognitive ability, and was completely debilitated.  (Plf.'s Dep. 201:4-202:24, Plf.'s Ex. 2).

24.      During his deposition, Plaintiff testified that, "The medication is what allows me to function.  The environment all within that control center is what affects my disabilities of acromegaly, which is an overgrowing of everything and malformation in ear canals. It deals with vision; it deals with stress and anxiety . . . .  So I have all that and then hypocalcemia which also is affected by stress and anxiety.  Being in there with all that stuff, the buzzing of the electronic equipment which caused the pain in the ear, radiation up and down causing headache, nausea, along with the smells of copy machines, no fresh air, funky lighting, it all was like the perfect storm. But, believe me, there were some days I probably would have liked to work in there, peace and quiet, but not being sick like that . . . .  Working in the control room exacerbated the acromegaly symptoms and the hypocalcemia symptoms which are anxiety, cognitive malfunction, okay. You don't think clearly, and stress. Acromegaly patients deal differently with stress than other people do, okay. And all this, boom, and causing the headaches and stuff, I'm like, okay, all this electronic radiation, whatever's in here, what's going on, okay. (Plf.'s Dep. p. 58:20-60:9, Plf.'s Ex. 2).

25.      Working in the control room for extended periods of time caused Plaintiff severe headache, dry heaving, nausea, dizziness, and pain that radiated up and down his neck and head. (Plf.'s Dep.p. 43, Plf.'s Ex. 2).

26.      Plaintiff states, "The control center, as it existed in 2012 is small, confined room with little to no fresh air flow. There is a large amount of electronics in the room. This includes several large tv monitors sectioned into multiple changing screen shots, 3 computer monitors, one of which is constantly logging door entry and exits throughout the facility, a fax machine, a

large copy machine, the large control panel with switches and light signals that flash and beep until deactivated by the control room person, a microphone, 2 large electrical boxes/servers with 2 or 3 cables tethered together running to the control panel that were each approximately 1 inch in diameter, and telephones. The control room position requires back and forth rapid movement amongst the various devices, working among the multiple, large monitors/screens in the small room. Constant buzzing noises of different pitches from various instruments in the room, fill the air. The combined total of everything in the control center was making me ill and aggravating my conditions."  (Plf.'s Decl ¶ 7, Plf.'s Ex. 1; Plf.'s Dep. p. 34, Plf.'s Ex. 2).

27.     The electrical/server boxes and cables emitted buzzing/droning/humming sounds and was responsible for causing Plaintiff most of the problems while he was in the control room. While the facility did have other monitors and computers located in other areas, the control room is the only place with a control panel with large wires running to a electrical/server box.  There was no other equipment in the facility that emitted similar buzzing/droning/humming sounds. (*See* Plf.'s Decl ¶ 8, Plf.'s Ex. 1).

28.     Plaintiff was already trained on how to run the control room and had knowledge on how to operate everything in it.  Plaintiff testified that running the control room was not a difficult task and he never had any issues running it from a know-how perspective.  The initial training for the control room was half an hour and all the controls in the room were labeled. (Plf.'s Dep. pp. 37, 79:12-24,  Plf.'s Ex. 2; Plf.'s Decl ¶ 13, Plf.'s Ex. 1).

29.     Plaintiff was assigned to the control room in late 2011/early 2012 by Ms. Kramer. She observed how it was affecting Plaintiff and said, "Get out of here. You know how to do that."  (Plf.'s Dep. p. 56, 120:7-19, Plf.'s Ex. 2; Plf.'s Decl ¶ 12, Plf.'s Ex. 1).

30.     When Plaintiff was assigned to the control room on the above occasion,  Director

of Probation and Court Services came to the detention center.  While he was there, Plaintiff explained to Mr. Hunt how working in the control room made him sick.  Mr. Hunt asked Plaintiff, "Do you know how to do everything in there?" and, "If it was an extreme emergency would you be able to go in there?"  Plaintiff responded in the affirmative to both questions. Mr. Hunt told Plaintiff, "Well, I see no reason for you to be here then." (Plf.'s Decl. ¶ 12, Plf.'s Ex. 1).

31.     After Plaintiff was assigned to work in the control room on the above occasion by Ms. Kramer, Plaintiff called Dr. Doering and told about working in the control room and how it had made him ill.  Dr. Doering told Plaintiff that if he ever needed an accommodation to let him know.  (Plf.'s Dep. p. 120, Plf.'s Ex. 2).

32.     On July 29, 2012, Ms. Kramer approached Plaintiff and said, "I've got some bad news. Brian's making me put you in control, and I know it makes you sick, but I can't get out of it."  Ms.  Kramer apologized for making Plaintiff do this, but reported she had no choice.  The room made Plaintiff physically ill, with symptoms of light headedness, headache, ear pain, neck pain, drained my energy, and caused pain in his eyes. (Plf.'s Dep. p. 119:3-7, Plf.'s Ex. 2; Plf.'s Decl. ¶ 14, Plf.'s Ex. 1).

33.     On August 1, 2012, Plaintiff called Dr. Doering to request that he write him a note for the accommodation that he not work in the control room.  A note requesting Plaintiff be excused from the control room was sent to Defendant by Dr. Doering that same day but was told by Defendant that the note did not provide sufficient information.  (Plf.'s Dep. p. 120:20-24, 121:21-22, Plf.'s Ex. 2; Plf.'s Decl. ¶ 14, Plf.'s Ex. 1).

34.     Plaintiff testified that many of the symptoms he was experiencing were reminiscent of the onset of his tumor/pituitary condition: lack of energy, vision pain, headache, light headedness.  (Plf.'s Decl. ¶ 15, Plf.'s Ex. 1).

35.     Plaintiff went in to see Dr. Doering on or about August 2, 2012.  Dr. Doering checked Plaintiff over and asked what was going on.  After Plaintiff explained, Dr. Doering told him, "The medical conditions you have and the disabilities you have can be exacerbated by certain stimuli." (Plf.'s Dep. pp. 121:9-122:13, Plf.'s Ex. 2; Plf.'s Decl. ¶ 15, Plf.'s Ex. 1).

36.     Plaintiff was given another note by Dr. Doering at that time providing more information that again requested that Plaintiff be excused from working in the control room. Plaintiff provided the note to Ms. Kramer, who responded, "Go back to the units.  That's good enough for me."  (Plf.'s Dep. p. 124:3-16, Plf.'s Ex. 2; Plf.'s Decl. ¶ 15, Plf.'s Ex. 1; *see also* Def.'s Ex. 1-M).

37.     Ms. Kramer approached Plaintiff 20 minutes later, apologizing, and stated that she was ordered to send Plaintiff back to the control room by Mr. Brown and that Plaintiff needed to provide a written response.  (Plf.'s Dep. pp. 124:20-125:3, Plf.'s Ex. 2; Plf.'s Decl. ¶ 15, Plf.'s Ex. 1).

38.     Plaintiff was then ordered to see the County's doctor, Dr. Hauter.  Plaintiff discussed with Dr. Hauter his history of Acromegaly/pituitary tumor/thyroid/calcium deficiency, the make-up of the control room, and explained that it was making him ill.  Dr. Hauter's letter to the County noted Plaintiff's history of Acromegaly and pituitary tumor. (Plf.'s Dep. pp. 124:20-125:3, Plf.'s Ex. 2; Plf.'s Decl. ¶ 16, Plf.'s Ex. 1).

39.     Specifically, the report from Dr. Hauter that was submitted to Defendant states, "Edward Youngman presents for a fitness for duty evaluation regarding his vertigo.  He states that he has a history of vertigo and motion sickness.  He has been treated in ENT in the past for right ear problems.  He has a history of pituitary tumor and acromegaly.  He states that he was working in the control room when he became nauseated and light headed.  He notes symptoms

start with right ear pain then neck and head ache occurs before the vertigo and lightheadedness." (<u>Dr. Hauter Report</u>, Plf.'s Ex. 9).

40.       Regarding the wording of the restrictions by Dr. Hauter, Plaintiff believes they could have been explained a better because Plaintiff could have done the job, but he could have been sick every day because of it.  (*See* <u>Dr. Hauter Report</u>, Plf.'s Ex. 9; Plf.'s Dep. p. 137:14-21, Plf.'s Ex. 2).

41.       Plaintiff was forced to work in the control center for a total of approximately nine days.  Mr. Brown acknowledged that Plaintiff had actually worked for over a week (over 5 days) in the control room.  When asked if Plaintiff had been trained by that point, Mr. Brown responded, "I mean, I mean, it would depend, but at that point we had him on light duty."  (Plf.'s Decl ¶ 17, Plf.'s Ex. 1; Brown Dep. p. 106:1-5, Plf.'s Ex. 3).

42.       On August 12, 2012, Mr. Brown met with Plaintiff personally for a few minutes and advised him that he was being placed on medical leave.  Mr. Brown asked Plaintiff if he had any suggestions for an accommodation, to which Plaintiff replied, "I'd like you to give me the accommodation due to my disabilities to not work in the control center, as two doctors have said I could come back to work outside of control." Mr. Brown responded, "I can't do that," and then handed Plaintiff his leave papers and told him to wait in the lobby.  (Plf.'s Decl ¶ 17, Plf.'s Ex. 1; Plf.'s Dep. pp. 138:22-139:12, Plf.'s Ex. 2).

43.       From that point forward, Plaintiff was not allowed in the building. He had no further in-person communication with the Defendant, only speaking briefly with a human resources representative regarding the monthly update he was required to send in from his doctor in order to maintain his medical benefits and my forced medical leave. (Plf.'s Decl ¶ 18; Plf.'s Ex. 1)

44.     On November 11, 2012, Plaintiff spoke with Personnel Director Kate VanBeek regarding a document needed from Defendant.  Plaintiff's wife attempted to talk with her, but she was told by Ms. VanBeek that she had nothing further to say, to refer to the letter sent via registered mail dated September 6, 2012, and that  if they had any questions to send them to Defendant in letter form and they would determine if a meeting was warranted.  (Plf.'s Decl ¶ 20; Plf.'s Ex. 1).

45.     The September 6, 2012, letter that Ms. VanBeek referred to states, "If you have any questions regarding this letter and or the FMLA process, please contact me directly or you may contact the Human Resources Department."  (Plf.'s Decl ¶ 20; Plf.'s Ex. 1).

46.     At no point during the entire process did anyone from the County meet with Plaintiff in person to discuss his concerns or reasoning for requesting the accommodation of not working in the control room. No one, including Mr. Brown when Plaintiff met with him on August 12, 2012, provided any explanation to Plaintiff that he was being assigned to the control room for training purposes due to complaints that were made by other counselors or that he would only be assigned to the control room for a week or two per year.  (Plf.'s Decl ¶ 21; Plf.'s Ex. 1)

47.     As far as Plaintiff knew, he was being assigned to the control room indefinitely. There was actually no precedent for Plaintiff being assigned to the control room without any explanation or time frame being given.  (Plf.'s Decl ¶ 21; Plf.'s Ex. 1; Plf.'s Dep. p. 197:20-23, Plf.'s Ex. 2).

48.     For instance, when Plaintiff was assigned to the control room in late 2011/early 2012 by Ms. Kramer, Plaintiff was informed at that time that it would only be for three days and was only for training purposes.  (Plf.'s Decl ¶ 22; Plf.'s Ex. 1).

49.     Plaintiff states that if he would have been aware that his assignment to the control room was only temporary, it would have changed everything including how he answered questions like, "Do you have any suggestions to accommodate you?".  Plaintiff explained that his headaches, dizziness, nausea, etc. were symptoms that built up over time and notes that he did not contact his doctor until the third day he was assigned to the control room, nor did he make any request for accommodation until the third day and that he had worked the control room, albeit with considerable discomfort, in late 2011/early 2012 for three days, and his symptoms got progressively worse each day. (Plf.'s Decl ¶ 23; Plf.'s Ex. 1).

50.     Plaintiff admits that he did start to feel pain, headaches, and discomfort within a short amount of time, but his symptoms always got worse on each consecutive day that he worked in the control room and it was working multiple days in the room that caused him to need to seek accommodations.  Plaintiff also states that he definitely could have worked in the control room during emergency situations. (Plf.'s Decl ¶ 23; Plf.'s Ex. 1; Plf.'s Dep. p. 197:6-8, Plf.'s Ex. 2).

51.     Because Plaintiff was not advised that his assignment was temporary, he was not able to suggest any solutions, such as that his assignment to the control room be separated out in half day or one day increments, which Plaintiff states would have been viable solutions. (Plf.'s Decl ¶ 22; Plf.'s Ex. 1).

52.     Mr. Brown never asked Plaintiff whether he could tough it out for "x" amount of days or provided Plaintiff with any information or suggested any alternative accommodations himself.  (Plf.'s Decl ¶ 22; Plf.'s Ex. 1).

53.     Mr. Brown admitted that Plaintiff never stated that he could not work the control room on an emergency basis.  Mr. Brown also admits that he never told Plaintiff that he was

being assigned to the control room for training purposes and he does not recall anyone ever suggesting to Plaintiff that if he could just make it through a week of training and he would be back working in the units.  (Brown Dep. pp. 38:4-15, 40:13-41:5, Plf.'s Ex. 3).

54.    Mr. Brown testified that he never engaged Plaintiff or his doctors to see if a compromise could be reached whereby he would not be assigned to the control room accept for one week per year and for emergency situations.  When asked if that would have worked for Mr. Brown, he testified that he would have taken it under consideration.  When asked why he did not make any suggestions for alternative accommodations, Mr. Brown stated that he was relying on Plaintiff to tell him.  (Brown Dep. pp. 100:22-101:14, 102:5-9, Plf.'s Ex. 3).

55.    Plaintiff testified, "I asked for a simple accommodation, all right, to accommodate my medical needs to work outside the control center, okay. I was denied that, not once, not twice, not three times, but at least four times, okay. And I was forced to work in that control room for at least ten days before I was forced on family leave, okay." (Plf.'s Dep.pp. 42-43, Plf.'s Ex. 2).

56.    Prior to the occasions he was assigned to the control room giving rise to this lawsuit, he had in the control room approximately 5 days in 13 years.  (Plf.'s Dep. at pp. 206:12-207: 4, , Plf.'s Ex. 2).  Mr. Brown has no reason to dispute that Plaintiff worked the control room 3 to 5 times during the five years preceding 2012.  Mr. Brown admits that Plaintiff never claimed that he could not work the control room because he had not been trained properly.  (Brown Dep. pp. 24:19-25:2, 28:6-8, Plf.'s Ex. 3).

57.    Under the new training regimen that was started by Mr. Brown, Youth Counselors would be trained one to two weeks in the control room per year, depending on proficiency. Mr. Brown was not aware of Plaintiff ever having any performance issues when he was assigned to

the control room previously and performed his job satisfactorily.  (Brown Dep. pp. 37:7-38:3, Plf.'s Ex. 3).

58.      Mr. Brown does not mention in his IHDR response, questionnaire answers, or position statement that Plaintiff could not be excused from the control room because of a hostile work environment complaint from an employee.  (*See* Brown Dep. Ex. 6, Plf.'s Ex. 12; Brown Dep. Ex. 7, Plf.'s Ex. 13; Brown Position Statement, Plf.'s Ex. 8).

59.      Mr. Brown testified that at the time that Plaintiff requested an accommodation to work in the control room by way of a doctor's note, he had "no idea" whether the request was medically related.   (Brown Dep. p. 41:6-21: Plf.'s Ex. 3).

60.      Mr. Brown testified that based upon the initial medical documentation from Dr. Doering, he had a suspicion that Plaintiff could not perform any assignment in the facility because of the mention of Plaintiff's difficulty with lights, electronics, and noise.  Mr. Brown also acknowledged that the medical documentation he was basing that off of was referring only to those items as they existed in the control room.  (Brown Dep. pp. 59:2-60:14,  Plf.'s Ex. 3).

61.      Mr. Brown believed that motion sickness and vertigo were interchangeable.  He also did not know if there was an underlying medical condition that caused the motion sickness and he did not inquire if there was an underlying medical condition.  Dr. Doering testified that motion sickness is just a symptom. Mr. Brown also read the document from Dr. Hauter that stated Plaintiff had a history pituitary tumor and acromegaly. (Brown Dep. pp. 61:4-62:22,  Plf.'s Ex. 3; Doering Dep. 35:19-36:13, Plf.'s Ex. 3).

62.      Mr. Brown acknowledged that the report from Dr. Hauter stated that Plaintiff could go back to work as long as he was not viewing multiple monitors, avoiding rapid alternating movements, avoid flashing lights, and no commercial driving.  Mr. Brown took the

restriction as meaning driving in general, as opposed to commercial driving, so he looked at that as concerns for driving kinds in a secure car and driving back and forth.  He then acknowledged that the report says no commercial driving, which meant no driving that required a CDL, and that Plaintiff's job did not require a CDL.  Mr. Brown also admits he did not know what "avoid flashing lights" meant and that took "avoid rapid alternating movement" to mean no "physical restraints, supervising kids running around, or playing basketball."  Mr. Brown never asked Dr. Hauter for clarification.  (Brown Dep. pp. 62:16-64:13, 74:21-75:3, Plf.'s Ex. 3).

63.     After receiving Dr. Hauter's report, Mr. Brown made the decision not to grant Plaintiff's accommodation.  Mr. Brown testified that during the meeting he had with Plaintiff notifying him that he was being placed on leave, Plaintiff mentioned his pituitary tumor and that Dr. Hauter had put that in his report and Mr. Brown acknowledged that at the time.  He testified that he did not know why Plaintiff mentioned that.  Mr. Brown also testified that Plaintiff told him that he did not have any issue with rapid movements and that he had proven he can do his job and that he only had issues with the monitors in the control room, not the other monitors in the facility.  (Brown Dep. pp. 67:18-68:5, 72:1-72:19, 74:2-15, Plf.'s Ex. 3).

64.     The August 12, 2012, letter that Mr. Brown provided to Plaintiff advising him that he was being placed on medical leave stated that "Dr. Doering specifically stated that lights, *moving, TVs in a room*, *and being around cameras* cause lightheadedness, ringing to ear, and headache."  Dr. Doering's note actually states, "Patient is having motion sickness related to control room he was recently assigned to.  Recommend patient not work in control room other than briefly . . . . *Because of* lights, noise, cameras, TVs *in room* having motion sickness symptoms of lightheadedness, ringing to ear, and headache." (emphasis added) (Def.'s Ex. 1-U; Def.'s Ex. 1-M).

65.     In Dr. Doering's note, the word "moving" does not appear and the words "in room" is clearly meant to apply to the lights, noise, cameras and TV's.  Mr. Brown defended the characterization of Dr. Doering's restrictions in the August 12, 2012, letter by suggesting that the words "in room" in Doering's note only applied to the TV's but he did acknowledge that the word "moving" does not appear in Dr. Doering's note.  (Brown Dep. pp. 75:4-78:16, Plf.'s Ex. 3; Def.'s Ex. 1-U; Def.'s Ex. 1-M).

66.     During his deposition, Mr. Brown was questioned about handwritten notes that had been written on a piece of paper.  He acknowledged that it was his handwriting and deduced that they were probably pre-meetings notes regarding questions he needed to ask regarding the August 12, 2012, meeting.  It was also represented to Ms. Brown that the notes were found on the backside of Dr. Hauter's report.  (Brown Dep. pp. 78:22-80:11, Dr. Hauter's Report w Brown's Notes, Plf.'s Ex. 9).

67.     Mr. Brown read the five lines at the top of the page which state: "Medical Leave, Contract Language, FMLA, Paperwork, Reasonable Accommodation, Release of Medical Documents".  Mr. Brown stated that he knew what the term reasonable accommodation pertains to, which was "can the employer accommodate someone's disability" and he knew that the relevant statute was the "ADA".  Mr. Brown also indicated that the notes say, "Is it a reasonable accommodation? Is it going to continue? Looking at duration."  Then, when asked to read the next line, Mr. Brown suddenly began having trouble reading it.  Mr. Brown was specifically asked if it says "Not say disability", to which he responded that he "can't really tell".  When asked specifically, "so, you don't know that that says disability", Mr. Brown replied, "No," and when asked, "Any idea what else it could say?", further testified, "No."  Mr. Brown testified that the next line states "Talk condition, illness", and he believes the last line says "Discuss".  (Brown

Dep. pp. 81:-84:12, <u>Dr. Hauter's Report w Brown's Notes</u>, Plf.'s Ex. 9).

68.     Mr. Brown testified that he viewed the note from Dr. Doering describing Plaintiff's condition and request for accommodation with the words "unchanging condition" and "lifetime" as advising that Plaintiff had a permanent disability.  (Brown Dep. pp. 86:3-18, Plf.'s Ex. 3; <u>Dr. Doering Note, September 19, 2012</u>, Def.'s Ex. 8).

69.     Mr. Brown acknowledged that the Office of the Chief Judge was his employer and that he appeared at the fact finding conference on behalf of the Office of the Chief Judge.  (Brown Dep. pp. 87:3-16, 88:18-89:5, 91:1-5; Plf.'s Ex. 3; Brown Dep. Ex. 6, Plf.'s Ex. 12).

70.     Mr. Brown acknowledged that the IDHR charge listed Peoria County Juvenile Detention Center as the Respondent, that the Peoria County Juvenile Detention Center is just the name of a building, and that the Peoria County Juvenile Detention Center does not employ anyone.  Mr. Brown answered the charge, answered the IDHR questionnaire, the signed the position statement of respondent relating to the charge.  (Brown Dep. pp. 90:21-92:3; Plf.'s Ex. 3; Brown Dep. Ex. 6, Plf.'s Ex. 12; Brown Dep. Ex. 7, Plf.'s Ex. 13; <u>Brown Position Statement</u>, Plf.'s Ex. 8).

71.     Mr. Brown provided substantive information in his response, questionnaire answers, and position statement about Plaintiff's employment and requests for accommodation, but does not mention anywhere in those documents that the Peoria County Juvenile Detention Center is not Plaintiff's employer and he did not make that argument at the fact finding conference, nor did he witness any attorney make that argument.    (Brown Dep. pp. 95:15-97:1; Plf.'s Ex. 3; <u>Brown Dep. Ex. 6</u>, Plf.'s Ex. 12; <u>Brown Dep. Ex. 7</u>, Plf.'s Ex. 13; <u>Brown Position Statement</u>, Plf.'s Ex. 8).

72.     Question 5 of the IDHR Questionnaire states, "If Complainant was employed at

Respondent, provide the following personnel data on Complainant: a) Date of hire; and name of person who made hiring decision".  Mr. Brown answered, "a) October 3, 1998; Former Superintendent Randy Barton made the hiring decision."  Mr. Brown signed the answers after being "sworn".  (Brown Dep. Ex. 7, Plf.'s Ex. 13).

73.     Regarding Plaintiff's charge of discrimination for failure to accommodate filed with the IDHR (and cross filed with the EEOC), the IDHR made a finding of substantial evidence in Plaintiff's favor and the EEOC made a finding of probable cause in Plaintiff's favor. The uncontested facts in the IDHR's report states, "Complainant was hired and worked at Respondent as a Youth Counselor/Supervisor since October 1998".  (IDHR Charge and IDHR/EEOC Findings, Def.'s Ex. 12).

74.     The Charge lists the Peoria County Juvenile Detention Center as the Respondent and the Respondent's address is the address of that building.  The Peoria County State's Attorney's Office is not listed or named on the charge, nor is its office address listed on the charge.  (IDHR Charge and IDHR/EEOC Findings, Def.'s Ex. 12).

## C.      ARGUMENT

## I.      <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate only when the record before the court demonstrate that there are no genuine issues of material fact, in which case the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  To determine if a genuine issue of fact exists, the court must "construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *Myers v. Hasara,* 226 F.3d 821, 825 (7th Cir. 2000).  If a reasonable jury could find in favor of the nonmoving party based on the evidence, summary judgment should be denied. *Lawson v. Transp., Inc.,* 245 F.3d 916, 922 (7th Cir. 2001); *see Paz v. Wauconda Healthcare & Rehab. Centre, LLC,* 464 F.3d 659, 664 (7th Cir. 2006) ("Summary judgment is not appropriate if a reasonable jury could just as easily return a verdict for the non-moving party.").

"[S]ummary judgment is improper in a discrimination case where a material issue involves any weighing of conflicting indications of motive and intent." *Kielczynski* v. *Vill. Of LaGrange,* 122 F. Supp. 2d 932, 943 (N.D. Ill. 2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," whether ruling on a motion for summary judgment or for a directed verdict." *Id.; see Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 150-53 (2000).

Summary judgment is not favored if issues of intent, good faith, or subjective feelings play an important role in determining the issues because these issues are usually not capable of being resolved by summary judgment. *White Motor Co. v. United States.* 372 U.S.253, 259 (1963); *Kephart v. Institute of Gas Technology,* 630 F. 2d 1217, 1218 (7th Cir. 1980); *Beard v. Whitley County REMC,* 840 F. 2d 405, 410 (7th Cir. 1988).

## II.   <u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>

Defendant argues that Plaintiff failed to exhaust his administrative remedies because Plaintiff failed to name the Chief Judge of the Tenth Judicial Circuit ("Chief Judge") as the respondent on his IDHR charge.  Defendant correctly points out, "Ordinarily, a party not named as the respondent in an EEOC charge may not be sued . . . ." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1089 (7th Cir. 2008). Defendant also further correctly points out that, "The purpose of limiting a plaintiff to sue only the respondent named in the EEOC charge is to 'give[ ] the employer some warning of the conduct about which the employee is aggrieved and afford[ ] the EEOC and the employer an opportunity to attempt conciliation without resort to the courts.' *Tamayo*, 526 F.3d at 1089 (quoting *Ezell v. Potter*, 400 F.3d 1041, 1046 (7th Cir. 2005)).  Plaintiff also agrees that one exception to this rule of thumb is "where an unnamed party has been provided with adequate notice of the charge, under circumstances where the party has been given the opportunity to participate in conciliation proceedings aimed at voluntary compliance, the charge is sufficient to confer jurisdiction over that party".  *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U. A.*, 657 F.2d 890, 905 (7th Cir. 1981).  Plaintiff disagrees with Defendant, however, regarding whether this exception applies to the case at bar.  Plaintiff maintains that it most certainly does apply.

The Seventh Circuit's decision in *Eggleston* is illuminating.   In that case, the plaintiff/complainant named Local 130 in the underlying EEOC charge, but failed to timely include the Joint Apprenticeship Committee ("JAC"), who was the actual employer.  *Eggleston*, 657 F.2d at 905.  In reversing the lower court's dismissal of the complaint against JAC, the Court noted:

> The purpose behind this exception is to prevent frustration of the goals of Title VII by not requiring procedural exactness in stating the charges.   Complainants often file

EEOC charges without the assistance of counsel and are not versed either in the technicalities of pleading or the jurisdictional requirements of the Act itself. They are also not expected to file EEOC charges which specifically articulate in precise terms, a narrow legal wrong which they have suffered, rather EEOC charges are typically detailed in lay person's terms. It is noted, in addition, that Congress could not have intended that a person filing EEOC charges should accurately ascertain, at the risk of later facing dismissal, at the time the charges were made, every separate entity which may have violated Title VII. Thus, given the Act's remedial purposes, charges are to be construed with "utmost liberality" and parties sufficiently named or alluded to in the factual statement are to be joined.

(citations omitted) *Id.* at 906.  The *Eggleston* court stated that the first issue was whether the charge "adequately served to notify the JAC of the alleged violation."   *Id.*  On that point, the Court found that five of the ten members on the JAC board also served as officers for Local 130, namely the business manager, the business representative, an executive board member, the vice-president, and the recording secretary.  *Id.*  The Court further found that the charge "clearly complained of discriminatory exclusion from the apprenticeship program", which was clearly a JAC program.  Based upon these findings, regarding the first prong of the exception, the Court stated, "Accordingly, in light of the substantial similarity in the interests of the JAC and Local 130 the named party, and given both the JAC representation and implication within the charge itself, we hold that the JAC knew or should have known of the EEOC charge and that their conduct would be subject to EEOC inquiry." *Id.*

The Court also found that the second prong of the exception had been met.  On that point, the Court noted:

Conciliation between the parties may solve discriminatory problems without the animosities created by coercion, and it provides the respondent with the chance to voluntarily explain and justify past conduct prior to the expense, publicity, and time

consumption associated with litigation. However, we are mindful that while conciliation is encouraged, it is not an inalienable right of a defendant. As soon as the JAC had notice of the charge, either through its Local 130 members or through the JAC coordinator, nothing prevented it from attempting to resolve the alleged discrimination in an amicable manner. Any opportunity to effect voluntary compliance of Local 130 by the EEOC would have necessarily involved contact with the JAC, its coordinator, and its other members. Thus, the JAC was presented with an adequate opportunity in this regard. Moreover, if a party has a close relationship with a named respondent, as does the JAC, and has actual notice of the EEOC charge, as it is likely the JAC has had, to the extent that the JAC could have participated in conciliation efforts, the JAC "should not be heard to cry 'foul' when later made a defendant in a suit...." (citations omitted) *Id.* at 906-907.

   In the case at bar, Plaintiff named the Peoria County Juvenile Detention Center ("PCJDC") as the respondent in his IDHR charge, referred to his employment at the PCJDC, and alleged that PCJDC failed to accommodate issues.  (Plaintiff's Statement of Additional Facts ("PSAF") ¶¶ 73-74).  Mr. Brown knew that Plaintiff's employer was the Office of the Chief Judge, the same as his own employer, that the PCJDC is just the name of a building and employs no one, and that it was he who refused to grant Plaintiff an accommodation.  (PSAF ¶¶ 63, 69-70, 72-73).  Thus, common sense dictates that Plaintiff was referring to the Office of the Chief Judge.  Mr. Brown worked for the Office of the Chief Judge as superintendent of the PCJDC, which was a high ranking position, and he submitted a response, answers to a questionnaire, a position statement, and went to the fact finding conference, all of which was clearly on behalf of the Chief Judge, thus he had a "close relationship" with the Chief Judge.  (PSAF ¶¶ 69-70).  The fact that Mr. Brown admitted that the PCJDC is just the name of a building and employs no one, begs the question, if it was not the Office of the Chief Judge who had a "chance to voluntarily explain and  justify past conduct prior to the expense, publicity, and time consumption associated

with litigation", then who or what was?  Mr. Brown was surely at the IDHR fact finding conference on behalf of some entity.

Defendant might suggest that Peoria County was the entity represented by Mr. Brown because it was the Peoria County State's Attorney who was served with notice, but Mr. Brown was not employed by Peoria County so he could not be signing responsive documents and appearing at fact finding conferences on behalf of Peoria County.  Furthermore, the PCJDC is no more the proper name for Peoria Country as it is for the Chief Judge.  If service upon the wrong attorneys for a party alone was dispositive of the issue, then the exception would be rendered useless.  Also, Plainitff's IDHR charge lists the PCJDC as the Respondent and lists that building's address.  However it was decided that the State's Attorney's office should be mailed the charge notice, is not Plaintiff's doing.   For the foregoing reasons, the *Eggleston* exception clearly applies.  *See also Curry v. Chateau del Mar, Inc.,* No. 07 C 6021, 2008 WL 5387118, at *2 (N.D. Ill. Dec. 22, 2008) (holding that the Eggleston exception applied because the named and unnamed parties had the same president and the substance of the plaintiffs' charges explicitly referred to events that took place at the unnamed respondent's location); *Denson v. Vill. of Bridgeview*, 19 F. Supp. 2d 829, 832 (N.D. Ill. 1998)  (finding that the case could proceed against the Board, who was not named in the EEOC charge because, "the Board not only knew about Denson's discrimination allegation, but has played an active role in defending against Denson's claim . . . the Board received correspondence from the EEOC about Denson's charge, sent correspondence to the EEOC, and received a copy of the EEOC's final determination regarding Denson's disability claim) (*citing Harris v. Stallman Trucking Co.,* 951 F.Supp. 134, 135–136 (N.D.Ill.1997)).

Also, the documents submitted by the Parties during the IDHR administrative process are

public records are the Court may take judicial notice of them.  *See Flores v. Bd. of Trustees of Cmty. Coll. Dist. No. 508,* 103 F. Supp. 3d 943, 949 (N.D. Ill. 2015).  Question 5 of the IDHR Questionnaire states, "If Complainant was employed at Respondent, provide the following personnel data on Complainant: a) Date of hire; and name of person who made hiring decision".  Mr. Brown answered, "a) October 3, 1998; Former Superintendent Randy Barton made the hiring decision."  This was Mr. Brown's "sworn" answer.  (PSAF ¶ 72).  Mr. Brown has admitted through his answer that the Respondent was his employer.  Also, the uncontested facts in the IDHR's report states, "Complainant was hired and worked at Respondent as a Youth Counselor/Supervisor since October 1998".  (PSAF ¶ 72).  Plaintiff believes that the misleading answer provided by Mr. Brown and his failure to dispute the fact that the PCJDC was not Plaintiff's employer were done intentionally to position Defendant to make the exact argument that it makes now.  The statute of limitations has run and Plaintiff cannot amend his charge.  For these reasons, Defendant should be equitably estopped from now arguing that the proper respondent is not named in the charge.  *See Mull v. ARCO Durethene Plastics, Inc.*, 784 F.2d 284, 292 (7th Cir.1986) (stating that equitable estoppel may be available when an employee's untimely filing was a result of "a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge." (citations omitted)).

## III.   FAILURE TO ACCOMMODATE

The Americans with Disabilities Act ("ADA") provides that the term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the

operation of the business . . . ." 42 U.S.C. § 12112(b)(5)(A).   In order to prevail on this claim,

Plaintiff must show: "(1) [he] is a qualified individual with a disability; (2) the employer was aware

of [his] disability; and (3) the employer failed to reasonably accommodate the disability." *EEOC v.*

*Sears, Roebuck & Co.,* 417 F.3d 789, 797 (7th Cir. 2005).

### A.  Plaintiff Is An Individual With A Disability

Under the ADA, an individual is considered disabled when he: "(a) has a physical or

mental impairment that substantially limits one or more of the individual's major life activities; (b)

has a record of such impairment; or (c) is regarded as having such an impairment.   Major life

activities also include the operation of a major bodily functions, including but not limited to . . .

normal cell growth . . . [and] endocrine functions.  42 U.S.C. §12102(2).

Plaintiff clearly has a record of, and currently has, a medical condition that substantially

limits his major bodily endocrine functions.   He had a pituitary tumor that caused acromegaly

(causing gigantism) resulting in clearly noticeable physical deformities and necessitated surgical

removal of his pituitary tumor and 10 percent of his pituitary gland.    He also had his thyroid

totally removed leading to hypothyroidism and hypocalcemia.   If he does not take his medicine for

his hypocalcemia, he would die and, in fact, he was in the hospital twice within the year preceding

the events giving rise to this lawsuit resulting in him being fed calcium through an IV for 12 hours

the first time and for 3 days the second time.   Plaintiff was completely debilitated on both

occasions.  (PSAF ¶¶ 1-9, 22-24).  *See* 42 U.S.C. §12102(4)(D) ("An impairment that is episodic or

in remission is a disability if it would substantially limit a major life activity when active."); 42

U.S.C. §12102(4)(E)(i) ("The determination of whether an impairment substantially limits a major

life activity shall be made without regard to the ameliorative effects of mitigating measures such as

. . . (I) medication"); 29 C.F.R. § 1630.2(j)(1)(i) ("The term "substantially limits" shall be

construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms

of the ADA. "Substantially limits" is not meant to be a demanding standard."); 29 C.F.R. § 1630.2(j)(1)(v) ("The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis."). Mr. Brown also viewed Plaintiff as having a disability. (PSAF ¶ 68).

Defendant's argument that Plaintiff's acromegaly was not a disability because it "did not affect him in 2012" is not true as that condition was still affecting him. (*See* PSAF ¶ 14). Regardless, Plaintiff would still meet the definition of disability in that he has a "record" of one. Furthermore, Plaintiff still had the disabilities of hypothyroidism and hypocalcemia which were affecting him.

Also, Defendant's argument that Defendant was not aware that his requests for accommodations were related his disabilities because Plaintiff's doctor's notes listed only motion sickness, this argument does not hold water. Mr. Brown was aware of Plaintiff's disabilities, his request written request for additional information regarding Plaintiff's accommodations stated that he wanted the to know the "medical condition *and/or* symptoms", he failed to engage Plaintiff or his doctors for more information about the cause of his motion sickness, and Dr. Hauter's note mentioned Plaintiff's acromegaly and pituitary condition. Most importantly, Mr. Brown testified that Plaintiff brought up his acromegaly in the meeting he had with him prior to being placed on leave. (DSMF ¶ 54; PSAF ¶¶ 19-22, 38, 54, 63).

Defendant cites to *Maciejewicz v. Oak Park Public Library*, 95 C 7119, 1996 WL 501743 at *3 (N.D. Ill. Sept. 3 1996) to support the proposition that Plaintiff's disability related to motion sickness is beyond the scope of the charge because it is a different disability than the acromegaly, pituitary tumor, hypothyroidism, and hypocalcemia. First, motion sickness is a symptom, not a

condition, and Defendant never insisted that Plaintiff or his doctors state the condition that was causing it. (PSAF ¶ 61). Thus, Plaintiff could not have listed "motion sickness" as a disability. Instead, he listed his disabilities that were causing it, which was proper. Second, *Maciejewicz* is not analogous because in that case the plaintiff was attempting to bring in an entirely different disability that was not raised in the charge as a basis for discrimination. It was not a case, like the one at bar, where the complainant alleged failure to accommodate a specific disability that was named in the charge intended to alleviate unspecified symptoms he experienced because of named the disability.

### B. Plaintiff Is *Qualified* Individual With A Disability

To be a "qualified individual" with a disability, a plaintiff must show that he is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that [he] holds or desires." *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. Ind. 2008). Defendant argues that Plaintiff is not a qualified individual with a disability because he could not perform the essential functions of his position. work in the control room. Federal Regulations concerning the ADA outline circumstances in which a job function may be considered essential if: (i) The function may be essential because the reason the position exists is to perform that function; (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 C.F.R. § 1630.2(n)(2). "Evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to

perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3).

Taking those factors into consideration, the facts reveal that operating the control room for outsider of emergency situations was not an "essential" job function. First, Defendant's job description contained many items that were not even remotely applicable to Plaintiff's job, i.e. fingerprinting, mug shots, cooking, cleaning, or maintenance. (See Plf.'s Response to DSMF ¶ 4). Prior to the occasions he was assigned to the control room giving rise to this lawsuit, Plaintiff had worked in the control room approximately 5 days in 13 years and Mr. Brown did not dispute that. Mr. Brown also acknowledged that he Plaintiff never stated that he could not work in the control room on an emergency basis and never had any performance issues in the control room.. (PSAF ¶¶ 53, 56-67). Plaintiff was already trained on how to run the control room and that running it was not a difficult task and he never had any issues running it from a know-how perspective. The initial training for the control room was half an hour and all the controls in the room were labeled. (PSAF ¶ 28). Also, when Plaintiff was assigned to the control room for 3 days in late 2011/early 2012, Mr. Hunt, the Director of Probation and Court Services came to the detention center and told Plaintiff as long as he could work the control room in emergency situation, he was fine with that. (PSAF ¶ 30). Furthermore, Plaintiff did, in fact operate the control room for approximately 9 days prior to being placed on leave. (PSAF ¶ 41). Lastly, Mr. Brown stated that people would only need to be placed in the control room for 1 to 2 weeks per year, which would hardly constitute an "essential job function", as long as Plaintiff could work there in emergency situations. (PSAF ¶ 57). While being able to work in the control room sporadically and in emergency situations may be an essential function (one which Plaintiff could

perform and Defendant knew he could perform), working several days or weeks straight in the control room was clearly a non-essential job function. *See Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 577 (7th Cir. Ill. 2001) ("The ADA requires an employer to make whatever accommodations are reasonably possible in the circumstances to perform the functions essential to his position, including removing nonessential functions from the job.").

Mr. Brown's characterization of Plaintiff not being able to do any job in the facility was disingenuous and was based upon him intentionally twisting the restrictions and interpreting them unreasonably without asking simple questions that would have clarified things.  (*See* PSAF ¶¶ 59-60, 62-65) Further, the requests for accommodation/restrictions only came from Plaintiff as a result of Mr. Brown not disclosing to him that his assignment to the control was temporary, which by the way, resulted in Plaintiff being placed on light duty in the control room, requiring him to be in the control room longer than he would have been assigned there had he not requested any accommodation.  (*See* PSAF ¶¶ 46-49, 51, 57).  Plaintiff was a qualified individual with a disability.

### C.  Plaintiff's Request For Accommodation Was Reasonable

In *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002),  the Supreme Court noted that "[t]he simple fact that an accommodation would provide a 'preference'—in the sense that it would permit the worker with a disability to violate a rule that others must obey—cannot, *in and of itself*, automatically show that the accommodation is not 'reasonable.'" *Id.* at 398 (emphasis in original). Instead, the Court outlined a two-step, case-specific approach.  The "plaintiff/employee . . . need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Id.* at 401.  Once the plaintiff has shown he seeks a reasonable method of accommodation, the burden shifts to the defendant/employer to "show special (typically case-specific)

circumstances that demonstrate undue hardship in the particular circumstances." *Id*. at 402. Plaintiff's request for accommodation was reasonable in that he was asking to be excepted from an assignment that he had only been assigned to less than 5 times in the previous 13 years.  Just because Defendant wanted to change its training policy, does not mean that it could not have excepted Plaintiff from that change; this is the very nature of an accommodation.  Defendant has not shown that it would have suffered any undue hardship by granting Plaintiff's request for accommodation.

### D.  Defendant Failed To Engage Plaintiff In An Interactive Process

Once an employer is aware of an employee's disability and the need for an accommodation has become apparent, the ADA requires an employer to "engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *E.E.O.C.    v.    Sears,    Roebuck    &    Co.,* 417  F.3d  789,  805  (7th Cir.2005) (quoting *Gile v. United Airlines, Inc.,* 213 F.3d 365, 373 (7th Cir.2000)).

> If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown: No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.

*Sears, Roebuck & Co.*, 417 F.3d at 805 (emphasis added, citations omitted).

In the case at bar, Mr. Brown did everything he could to appear as though he was engaging in an interactive process, but he was doing so in bad faith.  Again, Mr. Brown's that

Plaintiff could not do any job in the facility was disingenuous and was based upon him intentionally twisting the restrictions and interpreting them unreasonably without asking simple questions that would have clarified things. Mr. Brown remained willfully ignorant. (*See* PSAF ¶¶ 59-60, 62-65). This is hardly engaging with Plaintiff to determine if a reasonable accommodation could be made. *See Bultemeyer v. Fort Wayne Comm. Sch.,* 100 F.3d 1281, 1286 (7th Cir.1996) (employer should have sought an explanation from the doctor if it had concerns with the employee's medical diagnosis); *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061–62 (7th Cir. 2014) (finding that employer failed to engage in an interactive process when it did not seek further clarification from either employee or her doctor). Mr. Brown even prepared himself not to use the word disability during the meeting where he was supposed to be asking Plaintiff if there was any other accommodation that could be provided. (PSAF ¶ 66-67).

What is most damning to any assertion by Defendant that Mr. Brown was engaging in good faith, is that all of this could have been avoided had Mr. Brown simply just explained to Plaintiff that the move was temporary and asked him if there was a certain amount of time that Plaintiff could work in the control room. Instead, he hid this from Plaintiff and even forced him to continue working in the control room after he was arguably already "trained" there (which, by the way, all evidence is to the contrary that Plaintiff needed training there in the first place) because Mr. Brown placed him on light duty in the control room . . . in response to Plaintiff requesting an accommodation not to work in the control room. (*See* PSAF ¶¶ 46-49, 51, 57).

IV.    **CONCLUSION**

For all the foregoing reasons, Plaintiff respectfully request that this Court deny Defendants' Motion in its entirety.

Dated: May 28, 2018

Joshua McCann
Attorney for Plaintiff
10 N. Martingale Road, Suite 400
Schaumburg, IL  60173
(847) 466-1099

Respectfully Submitted,
**Edward Youngman**

By: _/s/Joshua McCann_____

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 28, 2018, I electronically filed **Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment** with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

By:    <u>s/Joshua McCann</u>
Joshua McCcann
Attorney for Plaintiff
10 N. Martingale Road, Suite 400
Schaumburg, IL  60173
(847) 466-1099