# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

EDWARD L. YOUNGMAN          )
    Plaintiff,          )
              )
    v.          )
              )    Case No.   16-cv-1005
CHIEF JUDGE STEPHEN A. KOURI          )
*and* PEORIA COUNTY          )    Honorable Joe B. McDade
              )
    Defendants.          )

## ORDER & OPINION

This matter is before the Court on Motions for Summary Judgment (Docs. 33, 35) filed by the Defendants, Chief Judge Paul P. Gilfillan[1] and Peoria County. The motions have been fully briefed. For the reasons stated below, the Chief Judge's Motion for Summary Judgment (Doc. 33) is GRANTED. Peoria County's Motion (Doc. 35) is DENIED as MOOT.

### UNDISPUTED MATERIAL FACTS[2]

Beginning in October 1998, Plaintiff Edward Youngman was employed as a Youth Counselor by the Chief Judge of the Tenth Judicial Circuit Court, Peoria, Illinois. Def.'s Statement Undisp. Facts, (Doc. 34 at 3, ¶ 2). Youth Counselors work at the Peoria County Juvenile Detention Center ("JDC"), and are responsible for the

---

[1] Judge Stephen Kouri no longer holds the position of Chief Judge. Pursuant to Federal Rule of Civil Procedure 25(d), his successor Chief Judge Paul P. Gilfillan is automatically substituted as a party. *See* FED. R. CIV. P. 25(d). Though Chief Judge Gilfillan has not filed a motion to substitute party, so the caption still contains Judge Kouri's name.

[2] These background facts are drawn from the parties' respective statements of material facts, and are undisputed unless otherwise indicated. Facts that are immaterial to the disposition of the Motion for Summary Judgment are excluded.

supervision, safety, care, and counseling of up to 63 juvenile detainees at the JDC. *Id.* ¶ 3.

Youngman was diagnosed with a pituitary tumor with acromegaly in December 1993, and he had surgery to remove his pituitary tumor and 10% of his pituitary gland on March 2, 1994. Decl. Edward Youngman at 2, (Doc. 37-2). Acromegaly is "a benign pituitary tumor" that "produces excessive growth hormone." Dep. Dr. James Doering, 12:14-18, (Doc. 34-32, Exh. 4). Acromegaly caused Plaintiff to suffer an overgrown thyroid gland. Youngman Decl., at 3. As a result, Plaintiff had a thyroidectomy in November 2011, resulting in hypothyroidism and calcium deficiency. *Id.* Plaintiff takes daily medication and is on calcium replacement therapy to address his health problems.

At issue in this case is a Youth Counselor's job duties in the JDC's control room. The control room serves as the location in which the JDC can be electronically monitored and controlled. Def.'s Statement Undisp. Facts, (Doc. 34 at 4, ¶ 5). During the relevant time period, the control room measured 24 feet by 19 feet, 3 inches, and it had computer monitors that displayed security camera footage, switchboards, a radio, and a telephone. *Id.* ¶¶ 7-8. The control room had overheard fluorescent lights—the same lights used throughout the entire JDC. *Id.* ¶ 9. Youth Counselors' duties in the control room included continuous electronic monitoring of activities throughout the JDC; electronically controlling access into secure areas; monitoring juveniles who are problematic, emotionally stressed, or have medical conditions; and

identifying unusual and dangerous conditions and notifying proper personnel. *Id.* ¶ 6.

Youngman typically worked the first shift, Sunday through Thursday, as Youth Counselor. The first shift was divided into three separate assignments: (1) control room; (2) living units; and (3) floaters. *Id.* ¶¶ 10-11. The first shift usually consisted of one Youth Counselor assigned to the control room, two assigned as floaters, and two or three assigned to each of the two living units. *Id.* ¶¶ 12, 14, 16. At least one Youth Counselor had to be in the control room at all times.

Sharon Kramer, a Detention Supervisor, was Plaintiff's direct supervisor and was responsible for assigning each Youth Counselor to one of the three possible assignments. *Id.* ¶ 23. Detention Supervisors reported directly to Superintendent Brian Brown. *Id.* Youth Counselors had preferred job assignments, and Youngman was typically assigned to a living unit and occasionally assigned as a floater. *Id.* ¶¶ 25, 35. When assigned to a living unit, a Youth Counselor is expected to be present in an educational room during the work day in order to monitor the juveniles. *Id.* ¶ 19. One educational room was a computer lab, which contained eight computer stations and a printer. *Id.* ¶¶ 17, 19, 21.

Though the JDC's written job description for Youth Counselors specifically explained "Control Room Duties," Youngman was assigned to the control room less than fourteen times during his thirteen years at the JDC. *Id.* ¶ 35; Doc. 34-2. Youth Counselors like Youngman who were not regularly assigned to the control room would

be assigned to the control room for only a couple of days annually to ensure such duties could be performed as needed during an emergency. *Id.* ¶ 32.

In June 2010, Brown received a complaint that another Detention Supervisor, Ryan Breedlove, was not fairly assigning to the three possible assignments. During the investigation into that complaint, other employees complained that the control room was not being fairly assigned either. *Id.* ¶ 28. As a result of the investigation, Peoria County recommended that Brown review scheduling including an assessment of the rotation of assignments. *Id.* ¶ 29.

On October 27, 2011, the issue of assigning Youth Counselors to the three possible assignments was discussed during a labor management meeting. *Id.* ¶ 30. Brown took the position at the meeting that all Youth Counselors needed to be trained everywhere and rotate in all duties. *Id.* Apparently it was well-known that Youth Counselors did not know how to perform all three assignments. *Id.* ¶ 26.

Beginning in 2012, all Youth Counselors on first shift who were not regularly assigned to the control room would be assigned for one or two weeks annually to ensure they could perform the duties. *Id.* ¶ 33. Kramer assigned Youngman to the control room for the week beginning Sunday July 29, 2012 through August 2, 2012. *Id.* ¶ 38. Neither Kramer nor Brown explained to Plaintiff that his placement in the control room was for training purposes and would not last longer than a week or two. Plf's Statement Undisp. Facts, (Doc. 37 at 58, ¶ 46). Plaintiff successfully completed his duties on July 29, 2012 and July 30, 2012. Def.'s Statement Undisp. Facts, (Doc. 34 at 17, ¶ 40).

Plaintiff called in sick on July 31, 2012. (Doc. 34 at 18, ¶ 41). On August 1, 2012, the fourth day he was assigned to the control room, Youngman gave Kramer a doctor's note signed by Dr. Jacob Doering stating, "p[atien]t can not work in control room due to medical concerns." *Id.* ¶ 42. Dr. Doering did not actually see Youngman in regards to his medical concerns prior to writing the note. *Id.* ¶ 43. The parties dispute whether Plaintiff was suffering from any symptoms or side effects of his pituitary tumor with acromegaly or hypothyroidism with calcium deficiency during the relevant times of this case. Plaintiff claims that working in the control room for extended periods of time causes him severe headache, dry heaving, nausea, dizziness, and pain that radiates up and down his neck and head.

On August 1, 2012, Brown gave Youngman a letter stating that Dr. Doering's note was too vague, and requesting information regarding: (1) what work restrictions he was actually requesting; (2) what particular duties within the control room he could not complete; and (3) what medical condition and/or physical symptoms prevent him from performing his job duties. *Id.* ¶ 44. Brown also stated that he would schedule a meeting with Youngman to discuss how to proceed after receiving this information. *Id.* Plaintiff worked his August 1, 2012 shift in the control room. *Id.* ¶ 45. On August 2, 2012, Plaintiff worked in the control room for six hours and then used two hours of sick time. *Id.*

On August 2, 2012, Plaintiff was officially placed on light duty, and pursuant to JDC policy, an employee on light duty is assigned to the control room. *Id.* ¶¶ 47-48. As such, Plaintiff was assigned to the control room again on August 5, 2012

through August 9, 2012. *Id.* ¶ 49. On August 5, 2012, Plaintiff submitted a note from

Dr. Doering stating,

> Patient is having motion sickness related to control room he has recently been assigned to. Recommend patient not work in control room other than briefly going in and out if needed but rather should be place elsewhere for his job. Because of lights, noise, cameras, tv's in room having motion sickness symptoms of lightheadedness, ringing in ear, headache. Diagnosis is motion sickness.

*Id.* ¶ 50.

On August 5, 2012, Plaintiff also submitted a written response to Brown's

request for information, stating,

> I am writing this in response to your memorandum dated 8/1/12, re – my medical note. The only restriction I am requesting is to not work in the control center, due to my medical concern of motion sickness. I am capable, and do complete all job duties in control. However, when I am in the control center, the following physical symptoms occur: 1. pain/ringing in ear that radiates to head and neck[,] 2. headache[,] 3. dizziness[,] 4. nausea. These symptoms are brought on by the confined space in the control center, combined with the large amount of electronics, and the activity and noise that comes from them. In closing, I am requesting to work living units, floater duties, or security unit.

*Id.* ¶ 51. Nonetheless, Plaintiff worked his regularly scheduled shift in the control

room August 5 through August 9, 2012. *Id.* ¶ 65.

On August 7, 2012, Brown issued a letter to Youngman directing him to submit

to a fit-for-duty exam on August 9, 2012, with Dr. Hauter, and informing him that he

could use medical leave and that FMLA paperwork would be made available. *Id.* ¶

66. Brown testified that the medical documentation from Dr. Doering made him

suspect that Plaintiff could not perform any assignment in the facility because of the

mention of Plaintiff's difficulty with lights, electronics, and noise. Plf's Statement Undisp. Facts, (Doc. 37 at 61, ¶ 60).

On August 9, 2012, following Dr. Hauter's examination, Dr. Hauter wrote a note stating that Youngman could not return to work without restrictions "as he has an imminent risk of injury to himself or others." Def.'s Statement Undisp. Facts, (Doc. 34 at 22, ¶ 67). He further stated that Youngman was medically qualified for work with the following limitations: no viewing of multiple TV or monitor screens, avoid rapid alternating movements, avoid flashing lights, and no commercial driving. *Id.*

On August 12, 2012, Plaintiff's next scheduled shift, Brown and a Detention Supervisor met with Youngman to explain that, based on his restrictions, he was going to be placed on medical leave of absence until his condition improved. *Id.* ¶ 69. During the meeting, Plaintiff asked Brown if he could just not work in the control room, but Brown said he could not do that. *Id.* ¶¶ 70-71. Neither party proposed another accommodation at that time.

On August 16, 2012, Peoria County Human Resources ("HR") received FMLA paperwork for Youngman completed by Dr. Doering. *Id.* ¶ 75. The paperwork stated that Plaintiff's condition commenced on July 29, 2012, that the probable duration of the condition was "continual if working in control room," and that Youngman was unable to perform any job in the control room. *Id.* The paperwork identified the condition as "motion sickness from control room monitors/noise." *Id.* ¶¶ 75-76. In response, HR asked Dr. Doering to clarify which actual job duties Plaintiff was unable to perform. In response, Dr. Doering wrote "Any job in the control room including

hearing and carrying conversation, reading and corresponding to info on computer screen, or sitting/walking/standing in the control room." *Id.* ¶ 76. HR asked Dr. Doering to clarify again. This time, HR circled three "physical requirements" on its job description of a Youth Counselor that it believed Youngman was unable to perform based on Dr. Doering's notes. It circled "Incumbent is required to sit, stand, and walk for various amounts of time to complete duties," "Hearing and speaking ability sufficient to carry on conversations with other individuals in person, over the telephone, and over the intercom," and "Visual ability sufficient to read and complete written correspondence and read information on a computer screen." *Id.* ¶ 77. In response to the question regarding whether it was correct that Youngman was unable to perform the circled requirements, Dr. Doering wrote "Yes, this is correct." *Id.* ¶ 78. Dr. Doering testified that he did not know if the lights, monitors, and noises in the control room were different from other areas of Plaintiff's workplace. *Id.* ¶¶ 58-60. He also testified that he did not know what "noise in the control room" meant. *Id.* ¶ 61.

On September 6, 2012, Youngman was granted FMLA leave and was instructed to provide an update on his medical condition by September 24, 2012, and every 30 days thereafter. *Id.* ¶ 79. From September 2012 through April 2013, Youngman submitted monthly updates regarding his condition from Dr. Doering, and stated each time that his condition had not changed. *Id.* ¶¶ 80, 85.

On February 12, 2013, Peoria County sent a letter to Youngman stating that his FMLA leave had expired, that his position would be filled, and when he was able to return to work, he would be placed in the first available opening most comparable

to his previous job. *Id.* ¶ 81. Plaintiff was instructed that he was required to continue providing updates from his doctor every 30 days. *Id.*

On February 14, 2013, Plaintiff filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") alleging that he was discriminated against and forced on medical leave because of his disability, and that the JDC failed to accommodate his "mental disability[ies]" "pituitary tumor with acromegaly" and "hypothyroidism with chronic calcium deficiency." *Id.* ¶¶ 82-83.

Plaintiff started a new job on April 30, 2013, but he did not inform anyone at the JDC and he stopped sending updates to the JDC on his medical condition. *Id.* ¶¶ 86-87. In August 2013, Brown sent Plaintiff a letter informing him that he was not in compliance with medical leave requirements because he had not submitted an update on his condition since April, and asked Plaintiff to send the required information by August 23, 2013. *Id.* ¶ 88. On August 22, 2013, Brown received a letter from Plaintiff essentially stating that he could always perform his job duties until Brown "forced [him] on medical leave. . . ." *Id.* ¶ 89. Plaintiff also stated that he could work with the simple accommodation of being outside of the control room. *Id.*

On August 26, 2013, Brown sent another letter to Youngman stating that he was insubordinate for failing to send the required information and directed Plaintiff to meet with Brown on August 28, 2013, to respond to the charge of insubordination. *Id.* ¶ 90. Plaintiff was given the option to submit paperwork previously requested to avoid discipline. *Id.* Brown rescheduled the meeting for August 30, 2013, after notification from Youngman's wife that he could not make the August 28, 2013

meeting. *Id.* ¶¶ 91-92. Youngman did not show up for the meeting, so Brown tried to contact Plaintiff in order to reschedule. *Id.* ¶¶ 95-96. The meeting was rescheduled for September 13, 2013, but Youngman again did not show up. *Id.* ¶¶97-99. Brown again rescheduled the meeting for September 20, 2013, but Plaintiff again did not appear. *Id.* ¶¶ 101-02.

On September 29, 2013, a facsimile was received from Youngman announcing his resignation, but his resignation was not accepted. *Id.* ¶¶ 103-104. On October 1, 2013, Plaintiff was terminated due to insubordination. *Id.*

On January 1, 2016, Youngman filed this lawsuit against the Chief Judge and Peoria County alleging violations of the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"). Plaintiff filed an Amended Complaint on May 9, 2016, alleging that the Chief Judge discriminated against him by failing to accommodate his disability. (Doc. 12).

On April 30, 2018, the Chief Judge filed a Motion for Summary Judgment arguing: (1) Plaintiff failed to exhaust his administrative remedies; (2) Plaintiff's claims related to motion sickness are outside the scope of his discrimination charge and therefore barred; (3) Plaintiff was not disabled; (4) Plaintiff was not a qualified individual because he could not perform the essential functions of the job; (5) the Chief Judge did not fail to reasonably accommodate Plaintiff; and (6) Plaintiff was responsible for the breakdown of the interactive process. (Doc. 33). Peoria County also filed a Motion for Summary Judgment arguing that it was named in the case purely for indemnification purposes, but that it should be granted summary judgment

because the state, not the county, would indemnify the Chief Judge. (Doc. 35). Plaintiff filed a response on May 28, 2018, (Docs. 37), and the Chief Judge filed a Reply on June 8, 2018, (Doc. 39). Thus, this matter is ripe for decision.

STANDARD OF REVIEW

Summary judgment shall be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant. *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011).

To survive summary judgment, the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which [it] bears the burden of proof at trial." *Warsco v. Preferred Technical Grp.*, 258 F.3d 557, 563 (7th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *See McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

Merely stating that a fact is disputed is not enough to establish that such a fact is genuinely disputed. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c). Moreover, Central District of Illinois Local Rule 7.1(D)(1)(b) and (2)(b)(2) require citations to relevant documentary evidence. Courts are well within their discretion to treat unsupported facts as undisputed for purposes of deciding the summary judgment motion. FED. R. CIV. P. 56(e).

## DISCUSSION

"The ADA was enacted 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Stevens v. Illinois Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000) (quoting 42 U.S.C. § 12101(b)(1)). The ADA targets discrimination in employment (Title I) and public accommodations (Title II). *Id.* "Under Title I, a covered entity may discriminate in two ways: disparate treatment of or failure to accommodate a disabled employee." *Id.* (citing 42 U.S.C. § 12112). In this lawsuit, Plaintiff claims that the Chief Judge

failed to accommodate his disability. Like lawsuits under other federal discrimination statutes, a plaintiff must first exhaust his administrative remedies before filing a civil suit under the ADA by filing a timely EEOC charge and receiving a right-to-sue letter. *Gogos v. AMS Mechanical Systems, Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013).

The Chief Judge argues that Plaintiff has failed to exhaust his administrative remedies, but that even if Plaintiff has exhausted, Plaintiff's claims fail on the merits. As will be discussed below, the Court finds that Plaintiff has exhausted his administrative remedies, but that no reasonable trier of fact could conclude that the Chief Judge violated the ADA in this case. Therefore, the Chief Judge is entitled to summary judgment as a matter of law.

## I.    Plaintiff Exhausted His Administrative Remedies

The Chief Judge argues that he is entitled to summary judgment because Plaintiff did not name the Chief Judge in his charge of discrimination. Rather, Plaintiff named "Peoria County Juvenile Detention Center" as his employer. Ordinarily a plaintiff who fails to name a particular defendant in a charge of discrimination is prohibited from naming that same defendant in a subsequent civil suit. *Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130, U. A.*, 657 F.2d 890, 905 (7th Cir. 1981). The purpose for the rule is twofold: "First, it serves to notify the charged party of the alleged violation. Second, it gives the EEOC an opportunity for conciliation." *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 126 (7th Cir. 1989). There is an exception to the rule where a plaintiff can prove that an unnamed defendant "has been provided with adequate notice of the charge," and where "that

party has been given the opportunity to participate in conciliation proceedings aimed at voluntary compliance." *Eggleston*, 657 F.2d at 905. Given the ADA's remedial purposes, "charges are to be construed with 'utmost liberality' and parties sufficiently named or alluded to in the factual statement are to be joined." *Id.* at 906.

Plaintiff argues that the Chief Judge was on notice of the charge and was given opportunity to participate in conciliation proceedings because Plaintiff's charge "referred to his employment at the [] JDC, and alleged that []JDC failed to accommodate issues." (Doc. 37 at 69). Plaintiff also argues that the Chief Judge had notice because Superintendent Brown was employed by the Chief Judge, and Brown was the one who answered the charge, answered the IDHR questionnaire, and signed the position statement of respondent relating to Plaintiff's discrimination charge.

The Court agrees with Plaintiff. *Harris v. Stallman Trucking Co.*, 951 F.Supp. 134, 136 (N.D. Ill. 1997), is instructive. There, the plaintiff filed an EEOC charge naming Stallman Trucking whom Plaintiff incorrectly believed to be his employer. The Plaintiff discovered he was technically employed by DuPage Paper Stock, and named both Stallman and DuPage Paper in his federal lawsuit. *Id.* The Northern District of Illinois held that DuPage Paper was put on notice because the EEOC charge clearly complained about discriminatory conduct of plaintiff's employer; the plaintiff's supervisor at Stallman was also an officer of DuPage Paper, and; the supervisor knew plaintiff had filed charges incorrectly naming Stallman. *Id.*

Likewise here, Superintendent Brown knew that Plaintiff incorrectly named the JDC as his employer. Brown acknowledged that the JDC does not employ anyone;

rather, the JDC is just the name of the building. (Doc. 37, ¶ 70). Brown himself, a high-ranking official, is also employed by the Chief Judge, and was apparently appearing on behalf of the Chief Judge in answering Youngman's charge. *See Eggleston*, 657 F.2d at 906 (the local union was adequately put on notice where high-level officers in the union were named in the charge). Plaintiff's charge clearly complained of discrimination in his position as a Youth Counselor at the JDC, and Plaintiff's supervisor at the JDC reported directly to Brown. The Chief Judge, through Superintendent Brown, knew or should have known that Plaintiff was complaining about his employment for the Chief Judge. The technical misidentification of Plaintiff's employer does not defeat notice in this case.

The Chief Judge also argues that Plaintiff's claims related to motion sickness are outside the scope of his discrimination charge. In his charge, Plaintiff stated "[f]ailure to accommodate mental disability, pituitary tumor with acromegaly," and "[f]ailure to accommodate mental disability, hypothyroidism with chronic calcium deficiency." (Doc. 1-1, 2-3). Plaintiff did not explicitly reference "motion sickness."

As a general rule, "[a]n aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1994). But the Court disagrees with the Chief Judge's contention that Plaintiff is seeking relief for a different instance of discrimination than that claimed in his charge.

"The test for determining whether a plaintiff's claims are within the scope of his E.E.O.C. charge is: (1) whether there is a reasonable relationship between the allegations in the charge and those in the complaint and (2) whether the claim in the complaint can reasonably be expected to grow out of an E.E.O.C. investigation of the allegations in the charge." *Stansberry v. Uhlich Children's Home*, 264 F. Supp. 2d 681, 687 (N.D. Ill. 2003); *see Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir. 1985). As the Chief Judge acknowledges, the "scope" rule usually applies when a Plaintiff references one form of discrimination in his charge, say race discrimination, but then sues for a different form of discrimination, say gender discrimination, in his federal lawsuit. That is not what is going on here.

Plaintiff does not argue that his disability *is* motion sickness, at the exclusion of acromegaly and hypothyroidism. Rather, Plaintiff argues that his symptoms of motion sickness *are a direct result of* his disabilities—pituitary tumor with acromegaly and hypothyroidism with calcium deficiency. Plaintiff's claims in this lawsuit are reasonably related to, and can reasonably be expected to grow out of, the allegations in the charge.

The Chief Judge's reliance on *Maciejewicz v. Oak Park Pub. Library*, No. 95-7119, 1996 WL 501743, at *4 (N.D. Ill. Sept. 3, 1996), is unpersuasive. The district court there held that a Plaintiff could not bring a charge for discrimination based on a disability of Post-Traumatic Stress Disorder ("PTSD"), but then file suit based on a disability of alcoholism because PTSD and alcoholism were two entirely different and unrelated disabilities. *Id.* Youngman's claims here are based on the same disabilities

named in his charge: hypothyroidism with calcium deficiency and acromegaly. Youngman's federal claims merely expound on the alleged symptoms he experiences because of those disabilities while in the control room. Thus, Plaintiff has exhausted his administrative remedies.

## II.    ADA Failure to Accommodate Claim

Plaintiff argues that the Chief Judge discriminated against him under the ADA in that the Chief Judge failed to reasonably accommodate his disability. "Discrimination, under the ADA, includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee,' unless the employer 'can demonstrate that the accommodation would impose an undue hardship on the operation of the business.'" *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 796–97 (7th Cir. 2005) (quoting § 12112(b)(5)(A)). "To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Id.* at 797. "As to the third element, the 'ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation.'" *Id.* (citing *Baert v. Euclid Beverage, Ltd.,* 149 F.3d 626, 633 (7th Cir.1998)). "If a disabled employee shows that her disability was not reasonably

accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process." *Id*.

The Chief Judge avers that (1) Plaintiff is not disabled; (2) Plaintiff is not a qualified individual because he could not perform the essential functions of his job; (3) Plaintiff has failed to show that the Chief Judge took adverse action against him because of his disability or failed to accommodate his disability; and (4) Plaintiff was responsible for the breakdown of the interactive process. The Court will address each argument in turn.

## A. A Reasonable Trier of Fact Could Conclude that Hypothyroidism is a Disability Under the ADA

The first prong of a *prima facie* "failure to accommodate" claim requires Plaintiff to show that he is a qualified individual with a disability. The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). "Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." § 12102(2)(A). "Major life activities" also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." § 12102(2)(B).

Prior to the passage of the ADA Amendments Act of 2008 (ADAAA), courts applied a more stringent standard in determining whether an impairment substantially limited a major life activity such that it constituted a disability under the ADA. *See, e.g.*, *Scheerer v. Potter*, 443 F.3d 916, 920 (7th Cir. 2006). In passing the ADAAA, however, Congress intended to establish a "broad scope of protection" under the ADA and expressly rejected as overly restrictive the Supreme Court's interpretations of what constituted a disability. ADA Amendments Act of 2008, Pub. L. 110–325, 122 Stat. 3553 (2008) (noting that as a result of the Supreme Court's decisions in cases like *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), which "interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress," lower courts were defining "disability" too narrowly). Now, the EEOC's regulations interpreting the ADA instruct that "the term 'substantially limits' shall be construed broadly" and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i).

The Court finds that a reasonable trier of fact could conclude that Plaintiff was disabled under the ADA because hypothyroidism is an affliction of the endocrine system. Plaintiff has indisputably been diagnosed with acromegaly and hypothyroidism with calcium deficiency. Plaintiff's treating physician described acromegaly as "a benign pituitary tumor [that] produces excessive growth hormone." Doering Dep., 12: 14-18. Plaintiff's thyroid gland became overgrown due to acromegaly, requiring Plaintiff to undergo a total thyroidectomy in November 2011.

Plaintiff now suffers from hypothyroidism and calcium deficiency. Plaintiff is on calcium replacement therapy as a result of hypothyroidism, and was hospitalized twice in 2012 for his condition. During the relevant time periods, Plaintiff was prescribed Levothyroxine for his thyroid issues. *See Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 446 (6th Cir. 2018) (a reasonable trier of fact could find that hypothyroidism is a disability under the ADA).

The Chief Judge argues that Plaintiff was not disabled during the relevant time because "there is no evidence that either [acromegaly or hypothyroidism] [] substantially limited Plaintiff in 2012." (Doc. 34 at 37). But Youngman need not show that his hypothyroidism substantially interferes with his ability to work in order to establish that he has a disability within the meaning of the ADA; he may show that it substantially interferes with another major life activity, such as the functioning of his endocrine system. *See Cloutier v. GoJet Airlines, LLC*, No. 16-1146, 2018 WL 2220289, at *7 (N.D. Ill. May 15, 2018) (rejecting Defendant's argument that diabetes did not count as a disability because diabetes did not "physically prevent [the plaintiff] from performing his job as a commercial airline pilot").

Furthermore, other diseases that impair endocrine functioning, like diabetes, are considered disabilities under the ADA. *See* 29 C.F.R. § 1630.2(j)(3)(iii) ("it should easily be concluded that ... diabetes substantially limits endocrine function"); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923–924 (7th Cir.2001) (holding that claimant with insulin-dependent diabetes was disabled in the major life activity of eating because of this endocrine impairment); *Cloutier*, 2018 WL 2220289. It only follows

that a fact-finder could reasonably conclude that hypothyroidism is a disability under the ADA. Youngman has presented enough evidence to show a material issue of fact regarding whether his hypothyroidism is a disability under the ADA.

### B. A Reasonable Trier of Fact Could Conclude that Plaintiff is a Qualified Individual

The Chief Judge argues that, even if Plaintiff is disabled, he is not a "qualified individual" because he could not perform the essential functions of the job. A "qualified individual" is someone with a disability "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

> To determine whether someone is a 'qualified individual,' we apply a two-step test. 'First, we consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.' *Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir.2001) (quotation omitted). 'If he does, then we must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation.' *Id.* (quotation omitted).

*Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2015). The Chief Judge argues that working in the control room is an essential function of the job, while Plaintiff claims that working in the control room on a <u>regular basis</u> is not an essential function of the job. Plaintiff argues that being available to work in the control room on an emergency basis only is essential. It is undisputed that Plaintiff cannot work in the control room on a regular basis.

The factors we consider to determine whether a particular duty is an essential function include "(i) The employer's judgment as to which functions are essential; (ii)

Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3); *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir.2010).

During the relevant time period, the JDC set forth the following "Job Duties and Responsibilities," in pertinent part, for a Youth Supervisor/Counselor at the JDC:

> Due to 24 hour operations of the facility, continual supervision of the detainees is necessary. Juveniles range in age from 10 to 21 years, both male and female. Provides 15 minute visual checks and/or suicide watch as mandated according to DOC standards. **Utilizes electronic equipment and radios for facility communications and documenting detainee locations, and participates in mandatory video surveillance.**

(Doc. 34-2 at 2) (emphasis added). It further provided,

> **Control Room Duties:**
> During control room duties the incumbent will be responsible for continuous monitoring of activities throughout the JDC complex through electronic surveillance and communication equipment.
>
> Electronically controls access into the secured areas, and identifying/screening authorized personnel and equipment prior of exit or entrance.
>
> Monitors problematic juveniles or those considered emotionally stressed or have medical conditions . . . .

*Id.*

The JDC's job description is compelling evidence that working in the control room, whether regularly or on an emergency basis, is an essential function of the job, especially considering Control Room Duties are specifically explained. However, the Court must consider the "evidence of the employer's actual practices in the workplace." *Miller v. Ill. Dept. of Transp.*, 643 F.3d 190, 198 (7th Cir. 2011). "[T]the content of a job description is merely one of several factors courts consider when determining whether a function is essential." *Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016). Recent Seventh Circuit case law suggests that where a job description conflicts with actual practices, summary judgment is inappropriate on the issue.

In *Shell v. Smith*, 789 F.3d 715, 718-719 (7th Cir. 2015), the employer's job description suggested that having a CDL license was an essential function of the job. However, "driving buses on public roads was not part of" plaintiff's "regular duties for any portion of the twelve years he held the position," precluding summary judgment on the issue. *Id.* at 719.

In *Miller*, 643 F.3d at 197, the Seventh Circuit held that an issue of material fact existed concerning whether working above 25 feet in an extreme or exposed position was an essential function of every member of a bridge crew. *Id.* It explained,

> Plaintiff has come forward with substantial evidence showing that his bridge crew did not actually work that way. The bridge crew worked as a team. No one person was assigned permanently to any one task. Although individual members of the team did various tasks as needed, there was no requirement that the bridge crew members rotate from task to task in an organized, routine fashion, such that it was necessary for any one member of the bridge crew to be able to do every task of the bridge crew as a whole.

Miller has presented evidence that, at least prior to March 23, 2006, the team accommodated the various skills, abilities, and limitations of the individual team members by organizing itself according to those skills, abilities, and limitations. . . .

Here, a reasonable fact-finder would have to conclude that *some* members of the bridge crew had to be able to work at heights in exposed or extreme positions so that the bridge crew—as a unit—could do its job, just as some members of the crew had to be able to weld, ride in the snooper bucket, spray, mow, and rake. That conclusion does not mean that the fact-finder would be required to conclude that *each* member of the bridge crew had to be able to do *every* task required of the entire team.

*Id.*

The reasoning in *Miller* is persuasive when applied to the record before the Court. Youngman has presented evidence that all Youth Counselors were not actually required to regularly work and rotate through all three assignments, including the control room, and that most Youth Counselors were assigned based on preference. While both parties agree that having a Youth Counselor present in the control room is important, Youngman has presented evidence that he worked in the control room less than fourteen times during his thirteen years with the JDC. Brown also testified that, prior to 2010, "[a]ll Youth Counselors were supposed to be able to perform duties for all assignments; however, it became clear to me based on . . . my experience . . . that many Youth Counselors were not able to perform the duties for all assignments. Specifically, I observed and was informed by Detention Supervisors that Youth Counselors who were regularly assigned to work the third shift, but who were working overtime on the first shift, were unable to perform the floater duties and control room duties." (Doc. 34-1, ¶ 26).

Furthermore, even after the policy changed in 2012, Youngman's supervisor, Kramer, testified that all Youth Counselors on first shift who were not regularly assigned to the control room would only be assigned <u>for one or two weeks a year</u> to ensure they could perform the duties. (Doc. 34-31, ¶ 5). Working an assignment for only one or two weeks out of an entire year suggests working in the control room regularly is non-essential. *Cf Kauffman v. Petersen Health Care VII, LLC,* 769 F.3d 958, 962 (7th Cir. 2014) (summary judgment inappropriate where there was factual disputes concerning whether alleged essential function occupied a lot or very little of Plaintiff's workday). Based on this evidence, a reasonable fact finder could conclude that it was not essential that *every* Youth Counselor work in the control room regularly.

Even if a jury found that working in the control room on an emergency basis is essential, Plaintiff has presented enough evidence that he can work in the control room on an emergency basis to defeat summary judgment on this issue. Defendant argues that the medical professionals in this case agree that Plaintiff cannot work in the control room at all. Both Dr. Hauter and Dr. Doering agreed that Plaintiff cannot view multiple TVs or monitors, and that he should avoid flashing lights and rapid movements. Furthermore, once Youngman went on medical leave, Dr. Doering provided monthly updates on Youngman's condition, indicating each time that Youngman could not work in the control room. (Doc. 34-36).

However, Dr. Hauter's and Dr. Doering's opinions have to be considered in context. Prior to 2012, Youngman spent very little time in the control room and was

almost never assigned there. After the policy changed, all Youth Counselors on first shift who were not regularly assigned to the control room would only be assigned for one or two weeks a year to ensure they could perform the duties, but nobody at the JDC informed Plaintiff of this. For all Plaintiff knew, he was going to be regularly assigned to the control room. Plf.'s Statement Undisp. Facts, (Doc. 37 at 58, ¶¶ 46-47). Had Plaintiff been informed that his control room assignments were only temporary and for training purposes, the doctors' recommendations may have been modified. Plaintiff presented evidence that he successfully worked in the control room when needed or required for training before, and he successfully worked in the control room for approximately nine days in August 2012 before entering medical leave. Thus, a reasonable trier of fact could conclude that Plaintiff could work in the control room on an emergency basis without an accommodation if doing so was essential.

### C. Even if Plaintiff's Accommodation Request was Reasonable, Plaintiff was Responsible for Breakdown of Interactive Process

The Chief Judge contends that, even if Plaintiff is a qualified individual with a disability, summary judgment is appropriate because the Chief Judge did not fail to reasonably accommodate Plaintiff and Plaintiff was responsible for the breakdown of the interactive process. Plaintiff claims that his request to not work in the control room was reasonable because he was "asking to be excepted from an assignment that he had only been assigned to" very few times in the previous thirteen years. (Doc. 37 at 77). Youngman further responds that "Brown did everything he could to appear as though he was engaging in an interactive process, but he was doing so in bad faith"

by "intentionally twisting the restrictions and interpreting them unreasonably without asking simple questions that would have clarified things." *Id.* at 77-78.

The Court need not address whether Plaintiff's request to not work in the control room was reasonable because no reasonable trier of fact could conclude that the Defendant was responsible for the breakdown of the interactive process. In the end, Plaintiff did not provide the necessary clarifications concerning his medical restrictions in order for the JDC to determine a proper accommodation. *See Sears, Roebuck & Co.*, 417 F.3d at 805 ("According to an EEOC regulation, the purpose of the interactive process is to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'"). Furthermore, Plaintiff eventually stopped sending the information requested by the JDC altogether and failed to appear for multiple meetings. As such, Plaintiff was responsible for the breakdown of the interactive process.

The federal regulations implementing the ADA state that "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). The regulations further provide that "[t]he appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. pt. 1630, app.

"If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown". *Sears, Roebuck & Co.*, 417 F.3d at 805.

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or **failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary**. A party that obstructs or delays the interactive process is not acting in good faith. **A party that fails to communicate, by way of initiation or response, may also be acting in bad faith**. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility. For example, the cause of the breakdown might be missing information. The regulations envision such a cause:
>
>> [I]n some instances neither the individual requesting the accommodation nor the employer can readily identify the appropriate accommodation. For example, the individual needing the accommodation may not know enough about the equipment used by the employer or the exact nature of the work site to suggest an appropriate accommodation. Likewise, the employer may not know enough about the individual's disability or the limitations that disability would impose on the performance of the job to suggest an appropriate accommodation.
>
> 29 C.F.R. pt. 1630, app. **Where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown** and the party withholding the information may be found to have obstructed the process.

*Beck v. Univ. of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir. 1996) (emphasis added). After all, "an employer is obligated to provide a qualified individual with a reasonable accommodation, not the accommodation he would prefer." *Rehling v. City of Chi.*, 207 F.3d 1009, 1014 (7th Cir. 2000), *amended* (Apr. 4, 2000).

In *Steffes v. Stepan Co.*, 144 F.3d 1070, 1072 (7th Cir. 1998), the facts showed that the employer "had a difficult time clarifying the nature and extent of Steffes's medical restrictions." Her doctor's note stated that Steffes "has been ordered <u>not</u> to have exposure [to] chemicals". *Id.* A letter from Steffes's doctor the following month stated that "[s]he has been advised to avoid chemical exposure". *Id.* The Seventh Circuit noted that, considering her employer was a chemical company and "[g]iven the blanket nature" of the restrictions imposed by her doctor, the obligation fell to Steffes to update or further clarify the kinds of work she could do and the level of chemical exposure, if any, she could tolerate." *Id.* The Court also noted that the doctor's note "failed to address the exposure issues legitimately raised" by Stepan Co., and "displayed a poor understanding of the physical layout of the plant and the various activities occurring in and around the warehouse." *Id.* at 1072-73. Steffes, who had worked in the warehouse for fourteen years, had it within her power to explain the nature of the job to her doctor and to obtain a more comprehensive note. *Id.* at 1073. The Court further explained,

> [E]ven though Stepan decided not to rehire Steffes because her release was inadequate, the company asked Steffes to provide updates if her condition changed so that the company could continue to consider her for job openings. Steffes did not provide any further information to the company. Because Steffes failed to hold up her end of the interactive process by clarifying the extent of her medical restrictions, Stepan cannot be held liable for failing to provide reasonable accommodations.

Youngman's case closely parallels *Steffes*. First, the undisputed evidence shows that the information provided to the JDC by Youngman and his doctor was inadequate, or at the very least incomplete, which made it difficult for the JDC to

determine an appropriate accommodation. Plaintiff's first doctor's note was vague, stating only that "p[atien]t can not work in control room due to medical concerns." That same day, Brown promptly requested more information regarding Plaintiff's medical conditions. On August 5, 2012, Plaintiff submitted another note from Dr. Doering stating that Plaintiff was having motion sickness related to the control room. However, the note also stated that the motion sickness was broadly due to "lights, noise, cameras, tv's." Dr. Doering testified that when he diagnosed Plaintiff with motion sickness he did not know if the lights, monitors, or noises in the control room were different from other areas of Plaintiff's workplace. He also testified that he did not know what "noise in the control room" meant, either. Like the employee in *Steffes*, Youngman was responsible for providing his doctor with better information.

Following Dr. Hauter's examination, Dr. Hauter wrote a note stating that Youngman could not return to work without restrictions "as he has an imminent risk of injury to himself or others." He further stated that Youngman could work with the following restrictions: no viewing of multiple TV or monitor screens, avoid rapid alternating movements, avoid flashing lights, and no commercial driving. When HR received Plaintiff's FMLA paperwork, it requested clarification twice. Dr. Doering responded both times that Youngman could not do any job in the control room including hearing, speaking, sitting, walking, or standing. In September, Youngman was granted FMLA leave and instructed to provide an update on his medical condition by September 24, 2012, and every 30 days thereafter. Youngman complied through April 2013, providing monthly updates signed by Dr. Doering. Each update

was brief and stated basically the same thing: that Youngman could not work in the control room and his condition had not changed. (Doc. 34-36, Exh. 8).

Given the broad and sweeping nature of the restrictions placed on Youngman by both doctors and the fact that the JDC had cameras, monitors, and identical fluorescent lighting throughout the facility, it was not unreasonable for Plaintiff's employer to request clarification or for Brown to place Plaintiff on medical leave. As an employee at the JDC for thirteen years, Youngman knew that there were cameras, monitors, and fluorescent lights elsewhere in the facility. As in *Steffes*, the obligation fell to Youngman to update or further clarify the kinds of work he could do and explain why he could sit, stand, and work in other rooms that contained monitors (like the computer lab) and fluorescent lighting, but not the control room. The notes from Dr. Doering did not provide such clarifications. If an employee does not provide sufficient information to the employer to determine the necessary accommodations, the employer cannot be held liable for failing to accommodate the disabled employee. *Brown v. Milwaukee Bd. of Sch. Directors*, 855 F.3d 818, 824 (7th Cir. 2017) (school not liable where it sought clarification numerous times, but plaintiff did not provide clarification and instead responded with the same explanation that she could not be near unruly students).

Second, the undisputed evidence shows that ultimately Plaintiff was responsible for the communication breakdown between the parties. On February 12, 2013, Peoria County sent a letter to Youngman stating that his FMLA leave had expired, that his position would be filled, and when he was able to return to work, he

would be placed in the first available opening most comparable to his previous job. Plaintiff was instructed that he was required to continue providing updates from his doctor every 30 days. He complied through April, but just repeated what he had already said before: that he could not perform any duties in the control room and his disability was permanent.

Youngman filed his charge of discrimination in February, and he started a new job in April. Plaintiff did not inform anyone at the JDC of his new position and he stopped sending medical updates to the JDC altogether. In August 2013, Brown sent Plaintiff a letter informing him that he was not in compliance with medical leave requirements and asked Plaintiff to send the required information by August 23, 2013. Plaintiff did not send the required information.

On August 26, 2013, Brown sent another letter to Youngman stating that he was insubordinate for failing to send the required information and directed Plaintiff to meet with Brown on August 28, 2013. Plaintiff was given the option to submit paperwork previously requested to avoid discipline. After notification from Youngman's wife that he could not make the August 28, 2013 meeting, Brown rescheduled the meeting for August 30, 2013. Youngman did not show up on August 30th, so Brown tried to contact Plaintiff in order to reschedule. The meeting was rescheduled for September 13, 2013, but Youngman again did not show up. Brown again rescheduled the meeting for September 20, 2013, but Plaintiff again did not appear.

*Steffes* commands that Plaintiff's behavior is fatal to his case. *See Beck*, 75 F.3d at 1136 (interactive process was initiated between the parties, but ultimately broken down by employee when she failed to provide more information to assist in accommodating her). Plaintiff provides absolutely no evidence to show that Brown was acting in bad faith, *see Haywood v. North Am. Van Lines, Inc.,* 121 F.3d 1066, 1071 (7th Cir.1997) (conclusory allegations and self-serving affidavits, unsupported by the record, will not preclude summary judgment), or to rebut the Chief Judge's evidence that Plaintiff was responsible for the breakdown of the interactive process. Thus, no reasonable trier of fact could hold the Chief Judge liable for failing to provide reasonable accommodations to Youngman.

### III. ADA Disparate Treatment Claim

In an apparent abundance of caution, the Chief Judge also argued in its Motion for Summary Judgment that Plaintiff failed to establish a disparate treatment claim under the ADA. A disparate treatment claim under the ADA is similar to disparate treatment claims under Title VII "in that the plaintiff attempts to show that she was treated differently than other workers on the basis of a protected characteristic." *Hoffman v. Caterpillar, Inc.,* 256 F.3d 568, 572 (7th Cir. 2001).

To the extent Plaintiff initially raised a disparate treatment claim, it is clear that Plaintiff has since abandoned that claim. Plaintiff's response to the motion for summary judgment only argues that "Defendant failed to accommodate Plaintiff and failed to engage in him an interactive process to see what alternative accommodations could have been made. Accordingly, Plaintiff requests that this Court deny

Defendants' Motion for Summary Judgment in its entirety." (Doc. 37 at 3). Nowhere in his response does Youngman develop substantive arguments related to a disparate treatment claim. Any such claim is therefore waived. *See Curtis v. Costco Wholesale Corp.,* 807 F.3d 215, 224 (7th Cir. 2015) ("[I]n opposing the motion for summary judgment, Curtis simply stated he satisfied his burden under both the direct and indirect methods of proof, directing the district court to his FMLA claim arguments, without developing any substantive argument and without any citation to any law or facts. Any arguments regarding Curtis's disparate treatment claim were therefore waived.").

Because no reasonable trier of fact could conclude that the Chief Judge has violated the ADA, the Court need not address Peoria County's Motion for Summary Judgment concerning the proper party for indemnification purposes.

## CONCLUSION

For the reasons stated above, the Chief Judge's Motion for Summary Judgment (Doc. 33) is GRANTED. Peoria County's Motion for Summary Judgment (Doc. 35) is DENIED as MOOT.

CASE TERMINATED.


Entered this 28th day of June, 2018.

s/ Joe B. McDade

JOE BILLY McDADE

United States Senior District Judge